# Illinois Official Reports

## Appellate Court

---

### *People v. Camacho*, 2016 IL App (1st) 140604

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE CAMACHO, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-0604 |
| Filed | August 9, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-3709; the Hon. Kay M. Hanlon, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Tomas G. Gonzalez, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Justices Neville and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Jose Camacho was sentenced to 32 years in prison after a jury found him guilty of first degree murder. On appeal, he contends the trial court erred in refusing to provide the jury with an instruction on mitigation from first degree murder to second degree murder due to provocation. We disagree. Camacho's version of the incident does not reveal any evidence of provocation that he willingly entered into the fight with the victim. Instead, his testimony establishes he acted defensively, fearing for his life.

¶ 2    Camacho also challenges certain monetary assessments imposed against him that he argues qualify as fines. Camacho argues, and the State correctly concedes, he is entitled to $5 per day of presentence custody credit against the $50 court system assessment. Regarding assessments intended to fund the technological advancement of both the State's Attorney's and public defender's offices, a prospective goal, we disagree they were intended to compensate the state for the costs associated in prosecuting a particular defendant, and classify them as fines.

¶ 3                              BACKGROUND

¶ 4    The State charged Camacho with first degree murder in connection with the May 24, 2001, death of Flavio Venancio. The police arrested Camacho in Mexico in 2012, and his trial began the following year.

¶ 5    The evidence at trial showed that Camacho lived with Jose Zavala and Jose Davila at Zavala's apartment in Hanover Park. Camacho and Zavala worked together. Zavala testified that, in the early morning hours of May 25, while he was sleeping, he heard a knock on his bedroom door. When he opened the door, he saw Camacho, who "looked sad" and was dirty. Camacho told Zavala that as he was driving, his passenger told him to go "faster" and "faster," and, when Camacho did, he lost control of the car and crashed. Camacho told Zavala the crash was the passenger's fault but that the passenger told Camacho it was his fault for "being a dumb ass" who could not drive. They got out of the car and Camacho told the passenger to bend over and "look at what he had done." After that, Camacho grabbed the passenger by the neck and began hitting him with a pen. Then, Camacho tried to drown the passenger, but felt "remorseful," so he pushed on the passenger's stomach so the water would come out. Zavala testified that Camacho never told him that the passenger had a weapon or tried to injure him.

¶ 6    That morning, when Zavala arrived at work, he saw Camacho's car in the employee parking lot. Zavala noticed damage to the front right side, something he had not seen before. Camacho, however, did not show up for work.

¶ 7    Davila testified that in the afternoon of May 24, 2001, Camacho drove him to work in his burgundy Mitsubishi, and Davila did not notice any damage to the car. Around midday the following day, Davila saw Camacho "[i]n a yard for work." Camacho told him he had a "problem" the night before with someone who lived in their apartment complex. Camacho said he and this person were drinking beer, and when they ran out, they entered Camacho's car and drove around to look for more beer. As they were driving, Camacho hit a guardrail. The passenger became "upset," told Camacho he could not drive, and told Camacho to let him drive, which made Camacho "upset." Camacho eventually drove to a "secluded place" and told the passenger to get out of the car. Then Camacho began hitting him with a pen in different parts of his body and submerged the passenger's head in a pond.

¶ 8    Camacho told Davila that, when he realized the passenger was not moving, he pulled the passenger out of the water and pushed on his stomach "to see if he would react." After water came out of the passenger's mouth, Camacho decided to leave. He threw his car's registration papers around the area so he could report the car stolen. Camacho did not tell Davila that the passenger had a weapon or threatened him or that Camacho was injured. After their conversation, Davila accompanied Camacho to a bus station where he bought a ticket to New York. Davila did not see Camacho again until trial.

¶ 9    Davila did not remember telling a grand jury that both Camacho and the passenger were hitting each other or that, after Camacho hit the passenger in the stomach with a pen, they both fell into the water. Davila further did not remember saying that, after Camacho put the passenger's head in the water, he pulled him out of the water and pressed on the passenger's stomach until water came out. Davila also could not recall telling the grand jury that when Camacho saw the passenger was "coming to," he thought to himself "God help him" and left.

¶ 10    Schaumburg police lieutenant Kurt Metzger testified he investigated a dead body found in a retention pond "off the beaten path" near the Schaumburg Metra train station. The body was facedown in the water with the back of the individual's head exposed. Near the pond, Metzger found a lanyard attached to an identification card for a "Pascual Fernandez." Metzger also found registration paperwork for a Mitsubishi Eclipse and an insurance card naming Homero Salgado and Antonio Perez of Anaheim, CA, as the owners. Metzger eventually learned the victim's name was Flavio Venancio. Other evidence at trial showed Flavio Venancio was Pascual Fernandez.

¶ 11    A week later, Metzger traveled to California and interviewed Perez and Veronica Tamayo, Camacho's wife. After these conversations, Metzger sought Camacho, who he learned used Salgado as an alias. During Metzger's conversation with Tamayo, she showed him a telephone bill with calls from collect call numbers. Metzger contacted the phone company and traced the calls to a residence in Hanover Park belonging to an individual by the name of Zavala. Metzger contacted Schaumburg police detective Vito Rago and told him to visit the Zavala residence.

¶ 12    That day, Rago met with Zavala, who took Rago to his employer's parking lot where Camacho had left his car. In the lot, Rago saw a red Mitsubishi Eclipse with damage to the front passenger side. Inside the car, Rago found muddy boots. Zavala did not know Camacho's whereabouts.

¶ 13    In California, Metzger and the Anaheim police department could not locate Camacho, and the police issued an arrest warrant for him. Eleven years later, Camacho was arrested in Mexico and extradited to the United States.

¶ 14    Crime scene technician James Herman investigated the dead body found in the retention pond. He noticed the victim was facedown in the water. Herman rolled the victim's body over; the victim's eyes were swollen shut, and he had lacerations above his left eye. Herman found a cartridge from the center of a fountain pen. And on a road near the scene, Herman saw maroon-colored paint on a damaged guardrail, broken car parts, glass, and a wheel cover with a Mitsubishi emblem.

¶ 15    Medical examiner Dr. Scott Denton performed the autopsy of Venancio and observed mud all over his body and in his nose, mouth, trachea, larynx, lungs, esophagus, and stomach. Venancio's stomach alone contained nearly 200 cubic centimeters of mud, more than half the liquid capacity of a soda can, and pieces of twigs and branches that Denton had never seen before. Based on the quantity of mud inside the body, Denton stated that Venancio must have

- 3 -

struggled "an excessive amount." Denton concluded that Venancio drowned under water by having his face pushed against mud, which required a "very forceful event." The drowning could not have been accidental due to the extent of Venancio's injuries. Denton noted that, after being submerged in the mud, Venancio likely lost consciousness within 60 seconds and thereafter could not voluntarily move.

¶ 16     There were about 20 stab wounds on Venancio, mostly concentrated on his face, consistent with being inflicted by a pen as well as various abrasions and impressions elsewhere on the body that also appeared to have been inflicted by a pen. An X-ray revealed a piece of pen with a metal tip 1½ inches long deep inside Venancio's left nostril. Denton stated that only "severe force" could have broken a pen inside of Venancio's nose, especially considering the pen was not "a standard plastic pen," but "very hard."

¶ 17     Additionally, there was evidence of Venancio being punched in the face multiple times and having been strangled. On Venancio's neck, Denton saw bruising consistent with manual strangulation and being punched or kicked, and hemorrhaging consistent with strangulation and blunt trauma. A bruise on Venancio's scalp was consistent with blunt force trauma from a log or piece of wood. Two defensive wounds on Venancio's left forearm and left hand looked consistent with movement to protect or defend his body.

¶ 18     Denton concluded that Venancio's cause of death was drowning, with contributing factors of strangulation and stab wounds, and the manner of death was homicide. Denton noted Venancio's blood-alcohol concentration would have been nearly three times higher than the legal limit to drive.

¶ 19     Camacho testified that he and Venancio were drinking beer for several hours until they ran out. They walked to Camacho's car and began driving around looking for more beer. As they were driving, Venancio told Camacho to "press the gas to see how fast [his car] would go," which Camacho did. Venancio then told Camacho to go somewhere to pick up drugs. Camacho did not want to become involved with drugs and refused. Venancio insisted on picking up the drugs and called Camacho a "f*** scaredy cat." Camacho again refused. As a result, Venancio became "upset," told Camacho he was going to drive the car, and grabbed the steering wheel. The car veered into a guardrail. Camacho became "upset" because Venancio had ruined his car. They both assessed the damage, and Venancio told Camacho to move the car off the road because if the police arrived, they would have "problems." After doing so, Camacho grabbed his car's paperwork and a pen so he could make a report for his insurance company.

¶ 20     With Venancio still inside the car, Camacho got out and bent down to again assess the damage. Venancio then got out and tried to persuade Camacho to go pick up the drugs. Again he refused. Venancio grabbed Camacho by his shirt collar, pulled him, and told him "let's go." Camacho swatted Venancio's hand away from him, and Venancio became upset, insulting Camacho with curse words. Venancio grabbed a knife "that bends" and said " 'I'm going to kill you,' " before attacking Camacho with the knife.

¶ 21     Camacho retreated backward, trying to avoid the knife. At some point, Venancio tripped and dropped the knife. Camacho picked the knife up and threw it away. Venancio became "very angry," again said " 'I'm going to kill you,' " and began punching Camacho. Camacho fought back and eventually they fell to the ground, with Venancio on top of Camacho. Venancio grabbed Camacho's neck and tried to strangle him. In response, Camacho grabbed Venancio's neck and tried to strangle him. Because Venancio was on top and would not let go,

Camacho looked for something on the ground with which to hit Venancio but could not find anything. Thereafter, Camacho found a pen in his pants pocket and hit Venancio with it. After using the pen for a little while, the pen broke, and both men stood up and continued fighting, moving into an area with water. Eventually, Venancio fell into the water and stopped fighting.

¶ 22　　Camacho pulled Venancio toward the shore. He realized Venancio had swallowed water and pushed on his stomach to get the water out. After water came out, Camacho noticed that Venancio was "breathing hard" and alive because his arm had moved. Camacho decided to leave as he did not want Venancio to attack him again. Camacho returned to Zavala's house and eventually left town because Venancio knew where he lived. Camacho abandoned his car because it would only drive a short distance.

¶ 23　　Camacho said his wife was in California in May 2001, but he was in Chicago to find work. He acknowledged using the name Homero Salgado on occasion. When Venancio pulled out the knife and threatened to kill him, Camacho became afraid. He was afraid even after he threw away the knife as Venancio continued to attack. Camacho maintained that he "tried to only defend" himself during the fight with Venancio and never hit him out of anger regarding what had happened to his car. Camacho denied leaving Venancio in the water. Camacho remembered Venancio "spit[ting] up a lot of water" and breathing hard. Camacho could not remember if he had any bruises or cuts as a result of the fight, but he was not hurt badly. Camacho recalled discussing the incident with Zavala and Davila, but he could not remember what he told either of them. Camacho also presented evidence that Venancio had been drinking alcohol during the day.

¶ 24　　At the conclusion of Camacho's case, the parties stipulated that Davila told a grand jury that Camacho had told him he and Venancio were hitting one another. Camacho then hit Venancio in the stomach with a pen, and both men fell into the water. Camacho pushed Venancio's face into the water and continued hitting him. After Camacho realized that Venancio was unresponsive, he pulled Venancio out of the water and pressed on his stomach to force out the water. When Camacho saw Venancio "was coming to," Camacho thought "let God help him" and left the scene.

¶ 25　　During the jury instructions conference, the court granted Camacho's requests for instructions on self-defense and second degree murder based on an unjustifiable belief of self-defense. It denied Camacho's requests for instructions on involuntary manslaughter and second degree murder based on provocation.

¶ 26　　The jury found Camacho guilty of first degree murder. Camacho filed an unsuccessful motion for a new trial, arguing, *inter alia*, the trial court erred in declining his proposed jury instruction on second degree murder based on provocation. The trial court sentenced Camacho to 32 years in prison.

¶ 27　　　　　　　　　　　　　　ANALYSIS
¶ 28　　　　　　　　　　Instruction Based on Provocation
¶ 29　　Camacho first contends that the trial court erred in refusing to instruct the jury on second degree murder based on provocation where there was sufficient evidence, if believed by the jury, to demonstrate he formed the intent to kill Venancio during the heat of mutual combat.

¶ 30　　The parties dispute the applicable standard of review. Camacho, citing *People v. Washington*, 2012 IL 110283, ¶ 19, argues our review should be *de novo*. In contrast and citing

- 5 -

*People v. Garcia*, 188 Ill. 2d 265, 283 (1999), the State argues our review should be for an abuse of discretion. Recently, this court noted, "the standard of review regarding whether evidence exists to support a jury instruction is unclear." *People v. Collins*, 2016 IL App (1st) 143422, ¶ 33 (contrasting *Washington*, 2012 IL 110283, ¶ 19, with *People v. Jones*, 219 Ill. 2d 1, 31 (2006), a case using an abuse of discretion standard). But, we need not resolve this conflict as our determination is the same under either standard. *Id.*

¶ 31   A defendant is entitled to a jury instruction on the provocation theory of second degree murder when the evidence supports it. *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997). The evidentiary threshold is low—as long as the evidence provides some foundation " 'however tenuous,' " the instruction should be given. *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 56 (quoting *People v. Looney*, 46 Ill. App. 3d 404, 410 (1977)). Also, the instruction should be given "regardless of the relative weight or credibility of that evidence." *People v. Willett*, 2015 IL App (4th) 130702, ¶ 93. Thus, the defendant's own uncorroborated testimony may form the evidentiary basis for the proposed instruction. See *People v. Pietryzk*, 153 Ill. App. 3d 428, 436-38 (1987).

¶ 32   Camacho argues the evidence could have persuaded a jury to conclude that he killed Venancio while they were engaged in mutual combat, thus supporting the provocation instruction. The State responds that mutual combat means the struggle between the two parties must be mutual, but Camacho's own testimony indicated he defended himself from Venancio's attack.

¶ 33   First degree murder and second degree murder share the same elements. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 53. The presence of a mitigating factor, such as serious provocation, accounts for the difference. *Id.* Accordingly, a lesser-mitigated offense of first degree murder is second degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995). The Criminal Code of 1961 provides that first degree murder may be mitigated to second degree murder if: "[a]t the time of the killing [the defendant] is acting under a sudden and intense passion resulting from serious provocation by the individual killed." 720 ILCS 5/9-2(a)(1) (West 2000).

¶ 34   "Serious provocation" involves "conduct sufficient to excite intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2000). Our supreme court has recognized four categories of serious provocation: (1) substantial physical injury or assault, (2) mutual combat or quarrel, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. Page*, 193 Ill. 2d 120, 133 (2000). " 'Passion on the part of the slayer, no matter how violent will not relieve him from liability for murder unless it is engendered by a serious provocation which the law recognizes as being reasonably adequate.' " *People v. Chevalier*, 131 Ill. 2d 66, 73 (1989) (quoting *People v. Matthews*, 21 Ill. App. 3d 249, 253 (1974)).

¶ 35   The serious provocation at issue is mutual combat, which has been defined as " 'a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat.' " *People v. Thompson*, 354 Ill. App. 3d 579, 588 (2004) (quoting *People v. Austin*, 133 Ill. 2d 118, 125 (1989)). Mutual combat connotes a shared intent to fight between the parties. *People v. Delgado*, 282 Ill. App. 3d 851, 859 (1996).

¶ 36   A defendant is not entitled to a mutual combat instruction where the testimony establishes only that the defendant "found himself [or herself] the unwilling participant in a fight and acted only to defend himself [or herself] from attack." *Id.*; see also *People v. Flores*, 282 Ill. App. 3d

861, 868 (1996) (stating defendant "was not entitled to a mutual combat instruction based on his testimony that he stabbed [the victim] in self-defense after [the victim] attacked him"); *People v. Lewis*, 229 Ill. App. 3d 874, 881 (1992) ("To warrant a 'provocation' instruction based upon mutual combat, the struggle must be *mutual*. Struggling with an attacker in an effort to ward off or defend one's self against an assault is not sufficient to warrant a provocation instruction." (Emphasis in original.)).

¶ 37    The jury heard two versions of what happened: one from the testimony of Jose Zavala and Jose Davila based on Camacho's statements to them hours after the incident; the other from Camacho himself. The version testified to by Zavala and Davila provided no evidence of mutual combat warranting an instruction on second degree murder based on provocation. They testified to a version of events in which Camacho instigated a fight with Venancio because he was upset over the car crash and Venancio's repeated insults toward him. "One who instigates combat cannot rely on the victim's response as evidence of mutual combat sufficient to mitigate the killing of that victim." *Austin*, 133 Ill. 2d at 126; see also *People v. Viramontes*, 2014 IL App (1st) 130075, ¶ 49 (same). Further, words alone, no matter how abusive, indecent, derogatory, or offensive, cannot raise a provocation defense. *Chevalier*, 131 Ill. 2d at 71-72.

¶ 38    Camacho's version of the incident similarly did not provide evidence of provocation. According to Camacho, Venancio attacked him, pulled a knife on him, and threatened to kill him. Camacho testified he was afraid of Venancio, even after Camacho threw away the knife, because Venancio continued to attack. Camacho stated he stabbed Venancio with the pen because Venancio would not stop strangling him and only tried to defend himself from Venancio. Camacho's testimony established that his actions were defensive as he feared for his life and did not suggest a willingness to enter into the fight with Venancio. Because Camacho only asserted he acted in self-defense, he is not entitled to a provocation instruction. See *Delgado*, 282 Ill. App. 3d at 859; *Flores*, 282 Ill. App. 3d at 868; *Lewis*, 229 Ill. App. 3d at 881.

¶ 39    Although Camacho testified he threw Venancio's knife away, this act did not transform the fight into one of mutual combat merely because Camacho and Venancio became engaged in hand-to-hand combat, as argued by Camacho. At this point, Camacho's actions still remained defensive, as shown by his consistent trial testimony that he acted only in self-defense and feared Venancio. Assuming *arguendo* that the struggle did transform into a mutual combat on equal terms, Camacho's infliction of more than 20 wounds to the face of a then-unarmed Venancio with a pen reflects retaliation that was disproportionate to their mutual quarrel consisting only of hands. See *Viramontes*, 2014 IL App (1st) 130075, ¶ 49 ("Provocation by mutual combat will not be found if the manner in which the accused retaliates is out of proportion to the provocation."). Therefore, no evidence entitles Camacho to a second degree murder instruction based on provocation, as there was no evidence of mutual combat. The trial court did not err in refusing the instruction.

¶ 40    Camacho relies on *People v. Leonard*, 83 Ill. 2d 411 (1980), and *People v. Phillips*, 159 Ill. App. 3d 142 (1987) to support his argument. In *Leonard*, 83 Ill. 2d at 414-15, the defendant brought a firearm to a confrontation with a security guard at the building from which the defendant's business had been evicted. Witnesses saw the defendant and guard engage in a struggle over a firearm, in which both held the weapon, the defendant by the handle and the guard by the barrel. *Id.* at 415. No one witnessed the start of the conflict. *Id.* at 414-16. During the struggle, the defendant shot the guard once and then pushed him over a banister to the

ground. *Id.* at 415. Our supreme court found evidence of mutual combat, which warranted tendering a provocation instruction to the jury because the defendant's intent to kill the security guard could have arisen before the struggle ensued or during the heat of the struggle. *Id.* at 421. In *Leonard*, there was no evidence of how the struggle between the security guard and the defendant arose or what the defendant's intent was during the struggle. In contrast, here, according to Camacho's version, the fight began after Venancio attacked Camacho, and Camacho's actions throughout the fight were solely defensive, thus providing no evidence to support a provocation instruction.

¶ 41 In *Phillips*, 159 Ill. App. 3d at 148, the defendant relied on his own testimony to support giving a jury instruction based on provocation. The defendant testified that he armed himself with a knife to scare his supervisor so that the supervisor would listen to him and stop harassing him. *Id.* at 146. When the supervisor saw the knife, he grabbed it from the defendant's waistband and swung it at the defendant. *Id.* After the knife slipped out of the supervisor's hand, the defendant picked it up and stabbed the supervisor. *Id.* The appellate court found the evidence that the supervisor took the knife, which the defendant claimed he had no intention of using, and swung it at the defendant, warranted tendering of a provocation instruction to the jury. *Id.* at 148-49. But, as pointed out in *Delgado*, 282 Ill. App. 3d at 859, *Phillips* did not "explain[ ] how a fight between two individuals, one of whom does not wish to fight and acts only in self-defense, can be considered 'mutual,' a term that connotes a shared or common desire." *Delgado* therefore declined to follow the reasoning in *Phillips*. *Id.* We too agree with the reasoning of *Delgado* and decline to rely on *Phillips*' analysis.

¶ 42 Accordingly, absent any evidence of provocation, the court's refusal to provide the jury with the instruction was not error.

¶ 43 Credits for Fines

¶ 44 Camacho next contends that the trial court failed to give him $5 per day of presentence custody credit against three of his assessments that he argues qualify as fines: a $50 court system assessment (55 ILCS 5/5-1101(c)(1) (West 2012)), a $2 State's Attorney records automation assessment (55 ILCS 5/4-2002.1(c) (West 2012)), and a $2 public defender records automation assessment (55 ILCS 5/3-4012 (West 2012)).

¶ 45 Although Camacho failed to raise the propriety of his assessments in the trial court, a reviewing court may modify a fines and fees order without remand. Ill. S. Ct. R. 615(b)(1) ("On appeal the reviewing court may *** modify the judgment or order from which the appeal is taken."); see *People v. McGee*, 2015 IL App (1st) 130367, ¶ 82 (ordering clerk of the circuit court to correct fines and fees order). As a matter of statutory interpretation, we review the propriety of a trial court's imposition of fines and fees *de novo*. *McGee*, 2015 IL App (1st) 130367, ¶ 78.

¶ 46 Camacho first argues, and the State correctly concedes, he is entitled to $5 per day of presentence custody credit against the $50 court system assessment (55 ILCS 5/5-1101(c)(1) (West 2012)). A defendant is entitled to a $5 credit for each day incarcerated toward the fines levied against him (725 ILCS 5/110-14(a) (West 2012)), and the court system assessment is a fine despite its statutory label as a fee. See *People v. Blanchard*, 2015 IL App (1st) 132281, ¶ 22 ("[T]he $50 Court System fee *** is a fine ***."). Therefore, Camacho must receive $5 per day of presentence custody credit toward this fine.

¶ 47    Camacho next argues that he also must receive $5 per day of presentence custody credit toward the $2 State's Attorney records automation assessment (55 ILCS 5/4-2002.1(c) (West 2012)) and the $2 public defender records automation assessment (55 ILCS 5/3-4012 (West 2012)). Camacho asserts these assessments are actually fines despite their statutory labels as fees because they do not seek to reimburse the state for the costs of prosecuting a particular defendant. The State responds that they are properly labeled as fees.

¶ 48    Fines and fees are distinguished based on their purpose. *People v. Graves*, 235 Ill. 2d 244, 250 (2009). A fee is an assessment intended to " 'recoup expenses incurred by the state,' or to compensate the state for some expenditure incurred in prosecuting the defendant." *Id.* (quoting *People v. Jones*, 223 Ill. 2d 569, 582 (2006)). An assessment "is a fee *if and only if* it is intended to reimburse the state for some cost incurred in defendant's prosecution." (Emphasis added.) *Jones*, 223 Ill. 2d at 600. In contrast, a fine is punitive, " 'a pecuniary punishment imposed as part of a sentence on a person convicted of a criminal offense.' " *Graves*, 235 Ill. 2d at 250 (quoting *Jones*, 223 Ill. 2d at 581). Although an assessment may be statutorily labeled as a "fee," it nevertheless may still be a "fine," despite the language used by our legislature. *Id.* While the legislature's language "is strong evidence" of its intent, "it cannot overcome the actual attributes of the charge at issue." *Jones*, 223 Ill. 2d at 599. Both *Jones* and *Graves* state that for an assessment to be a fee, it must not merely compensate the state for any expense, but rather expenses incurred in the prosecution of the defendant.

¶ 49    Section 4-2002.1(c) of the Counties Code (55 ILCS 5/4-2002.1(c) (West 2012)), the statute authorizing the State's Attorney records automation assessment, provides:

> "State's attorneys shall be entitled to a $2 fee to be paid by the defendant on a judgment of guilty or a grant of supervision for a violation of any provision of the Illinois Vehicle Code or any felony, misdemeanor, or petty offense to discharge the expenses of the State's Attorney's office for establishing and maintaining automated record keeping systems. The fee shall be remitted monthly to the county treasurer, to be deposited by him or her into a special fund designated as the State's Attorney Records Automation Fund. Expenditures from this fund may be made by the State's Attorney for hardware, software, research, and development costs and personnel related thereto."

The language of section 3-4012 of the Counties Code (55 ILCS 5/3-4012 (West 2012)), the statute authorizing the public defender records automation assessment, is nearly identical, albeit in the context of "discharg[ing] the expenses of the Cook County Public Defender's office." Therefore, the two assessments will be analyzed together.

¶ 50    The language of both statutes does not demonstrate that the purpose of the assessments is to compensate the state for the costs associated in prosecuting a particular defendant. Rather, both statutes demonstrate a prospective purpose intended to fund the technological advancement of both the State's Attorney's and public defender's offices, namely the establishment and maintenance of automated record keeping systems. As the statutes direct, the money collected from these assessments may be used for "hardware, software, research, and development costs and personnel related thereto." 55 ILCS 5/3-4012, 4-2002.1(c) (West 2012). It cannot be said that the costs associated with developing and researching automated record keeping systems is a cost associated with prosecuting a particular defendant.

¶ 51    Furthermore, the public defender records automation assessment applies to "a judgment of guilty *** [for] *any* felony, misdemeanor, or petty offense." (Emphasis added.) 55 ILCS 5/3-4012 (West 2012). Based on this language, the assessment may be applied against a guilty

defendant even when the public defender does not represent him. If the assessment can be imposed against a defendant when the public defender had absolutely no involvement in his or her case, the assessment's purpose is not to compensate the state for the costs associated with prosecuting a particular defendant.

¶ 52    We recognize every published decision on this matter has determined that both the State's Attorney and public defender records automation assessments are fees. But, these decisions have not independently analyzed the relevant statutes. Rather, they have simply relied on previous decisions without any meaningful analysis. See *People v. Maxey*, 2016 IL App (1st) 130698, ¶¶ 142-44 (relying on *People v. Rogers*, 2014 IL App (4th) 121088, and *People v. Bowen*, 2015 IL App (1st) 132046); *People v. Reed*, 2016 IL App (1st) 140498, ¶¶ 16-17 (relying on *Rogers* and *Bowen*); *People v. Green*, 2016 IL App (1st) 134011, ¶ 46 (relying on *Bowen*); *Bowen*, 2015 IL App (1st) 132046, ¶¶ 62-65 (relying on *Rogers*); *People v. Bradford*, 2014 IL App (4th) 130288, ¶ 41 (relying on *People v. Warren*, 2014 IL App (4th) 120721), *rev'd on other grounds*, 2016 IL 118674; *Rogers*, 2014 IL App (4th) 121088, ¶ 30 (relying on *Warren*). Thus, *People v. Warren*, 2014 IL App (4th) 120721, is the seed from which all these decisions have stemmed.

¶ 53    In *Warren*, 2014 IL App (4th) 120721, ¶ 107, *vacated*, No. 118322 (Ill. Jan. 20, 2016) (supervisory order reconsidering judgment in light of *People v. Castleberry*, 2015 IL 116916), the clerk of the circuit court imposed the State's Attorney records automation assessment against the defendant on both of his convictions. Because the assessment was enacted into law after the defendant committed his crimes, the appellate court had to determine whether the assessment was a fine, the imposition of which would thus violate the prohibition on *ex post facto* punishment, or a fee, in which case the assessment would be proper. *Id.* The court concluded the assessment was a fee, finding:

> "The plain language of section 4-2002(a) evidences the legislature's intent the $2 assessment be compensatory in nature. The assessment is to be used to 'discharge the expenses of the State's Attorney's office for establishing and maintaining automated record keeping systems.' [Citation.] Because the assessment is intended to reimburse the State's Attorneys for their expenses related to automated record-keeping systems, the assessment is not punitive in nature." *Id.* ¶ 108 (quoting 55 ILCS 5/4-2002(a) (West 2012)).

¶ 54    Although the assessment at issue in *Warren* was imposed under section 4-2002(a) of the Counties Code (55 ILCS 5/4-2002(a) (West 2012)), it is the same assessment imposed in this case under section 4-2002.1(c) of the Counties Code (55 ILCS 5/4-2002.1(c) (West 2012)). See Pub. Act 97-673 (eff. June 1, 2012) (amending 55 ILCS 5/4-2002, 4-2002.1). Our legislature has simply provided for different State's Attorney's assessments based on the population of the county.

¶ 55    Recently *Warren* was re-decided in *People v. Warren*, 2016 IL App (4th) 120721-B. The appellate court once again held the State's Attorney records automation assessment was a fee, using its verbatim language from the original *Warren* decision. *Id.* ¶ 115.

¶ 56    We disagree with *Warren*—the State's Attorney and public defender records automation assessments do not compensate the state for the costs associated in prosecuting a particular defendant. Accordingly, they cannot be considered fees. See *Jones*, 223 Ill. 2d at 600 (Assessment "is a fee *if and only if* it is intended to reimburse the state for some cost incurred in defendant's prosecution." (Emphasis added.)). As the assessments cannot be fees, they must be

- 10 -

fines. Therefore, Camacho is entitled to $5 per day of presentence custody credit against these fines. See 725 ILCS 5/110-14(a) (West 2012).

¶ 57    Under the authority of Illinois Supreme Court Rule 615(b)(1) and our ability to correct a fines and fees order without remand (see *McGee*, 2015 IL App (1st) 130367, ¶ 82), we order the clerk of the circuit court to award Camacho $5 per day of presentence custody credit toward his $50 court system fine, his $2 State's Attorney records automation fine, and his $2 public defender records automation fine.

¶ 58    The judgment of the circuit court of Cook County is affirmed in all other respects.

¶ 59    Affirmed as modified.