2021 IL App (1st) 200092-U
Order filed: August 20, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-20-0092

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances of Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 19772 |
| | ) | |
| RICARDO VASQUEZ, | ) | Honorable |
| | ) | Stanley Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirmed the summary dismissal of defendant's postconviction petition, finding that defendant failed to state the gist of a claim of ineffective assistance of trial and appellate counsel and that his postconviction counsel rendered reasonable assistance.

¶ 2    Defendant, Ricardo Vasquez, was convicted of first-degree murder and sentenced to 35 years' imprisonment. On direct appeal, we affirmed. See *People v. Vasquez*, 2017 IL App (1st) 143870-U. Defendant then filed a postconviction petition, alleging that his trial and appellate counsel provided ineffective assistance and that his sentence violated the eighth amendment and the proportionate penalties clause. The postconviction court summarily dismissed his petition, from which defendant now appeals. We affirm.

¶ 3    Defendant was charged by indictment with two counts of first-degree murder. The evidence at his bench trial demonstrated that the 18-year-old defendant fatally stabbed the 23-year-old victim, Carlos Cartegena, in the early morning hours of October 23, 2011. An initial altercation took place involving the victim and defendant's cousin, Michael Klee, during a party attended by all of the witnesses, the victim, and defendant. The fatal encounter between defendant and the victim occurred several hours later.

¶ 4    Nina Kantowski testified that at about 2 a.m. on October 23, 2011, she went to the party with the victim, her boyfriend at that time. The party was at a home on May Street near Wilson Park. During the party, a group, which included defendant, the victim, and Klee went to a nearby bank parking lot on 34th Place. While there, the victim and Klee argued. Kantowski "got pushed out of the way," and Klee punched the victim in the face. After the group left the parking lot, Kantowski and the victim returned to the party, which ended soon thereafter.

¶ 5    Kantowski refused a ride home from the victim as he had been drinking. As Kantowski was walking home, the victim pulled up and stopped his vehicle near the park and they began talking. Defendant appeared, went to the nearby bank parking lot, and said that he was looking for his keys. The victim got out of his vehicle and asked defendant about the identity of the person who had hit Kantowski during the earlier altercation. Defendant denied hitting her and warned the victim "he would be dead in a week." Defendant was holding the handle of a knife which was in the pocket of his hooded sweatshirt. Kantowski told defendant several times to put the knife away, which he eventually did. The victim was not armed and did not threaten defendant at any time.

¶ 6    Defendant made a call and claimed during that call that the victim had threatened him by saying "he was going to be dead in a week," which was what defendant had just said to the victim. The victim responded that defendant should "tell the truth because he never said that."

¶ 7    Kantowski advised the victim that they should leave; they walked away with the victim behind her. A man ran up to them wearing a black hooded shirt covering his face. The victim warned Kantowski to "run, to get help, to get [her] mom, to call the cops." As Kantowski ran away, she heard the sound of something crashing into a chain-link fence.

¶ 8    Marissa White testified that she went to the party with Klee, her then-boyfriend. Christian Delgado, her former boyfriend, was also there, and the two men argued. She explained that a group, which included defendant, the victim, and herself, moved from the party to the parking lot in order to prevent a physical altercation between Klee and Delgado. While in the parking lot, defendant had a "box cutter." The victim did not have any weapons.

¶ 9    On cross-examination, White stated she did not see defendant hit anyone while the group was in the parking lot. The victim "hugg[ed]" Klee to "stop him from running" after Delgado. After the group dispersed from the parking lot, White, defendant, and Klee searched the lot for the keys to defendant's father's vehicle. A police vehicle arrived, and the officers shone a light on the lot to help them find the keys. When the keys were not found, the officers drove them to Klee's sister's house. Defendant, at some point, left the house to return to the parking lot and search for the keys.

¶ 10    Steven Morris testified that at the party, Klee and White argued with Delgado, and the victim tried to stop the argument. Delgado, Klee, White, defendant, and Matthew Aguirre then left the house.

¶ 11    About 10 minutes later, Aguirre called and asked Morris to come to the parking lot where the group had assembled. When Morris arrived there, Klee and the victim were arguing because the victim had stopped Klee from fighting with Delgado. Defendant was holding a knife in his

hand and was opening and closing the blade. The victim told defendant to put the knife away. The victim was not carrying a weapon.

¶ 12     The victim drove Morris home. A short time later, the victim called Morris to say he would pick him up. However, about three minutes later, the victim called again and asked Morris to call an ambulance. A friend drove Morris to the scene, where the victim was lying "unresponsive" on the sidewalk.

¶ 13     Morris testified that he and the victim had belonged to a group called the Three Ones which supported a music label owned by a friend.

¶ 14     Aguirre testified that, at the party, Klee "seemed mad" at Delgado. When Delgado left the house, Klee was on the porch and attempted "to get after him." The victim came out of the house and grabbed Klee in a "bear hug" at the front gate to stop him, but Klee ran after Delgado to the parking lot. The group, including defendant, went to the parking lot, where the victim tried to calm Klee down.

¶ 15     Defendant became angry and asked the victim: "Why are you talking to my cousin [Klee] like that?" and called the victim a "b***h." Defendant held a switchblade in his hand, but he eventually put it away. The victim was unarmed. Klee punched the victim, and Aguirre shoved Klee to the ground. The victim then walked away, but later returned to the group. Defendant and the victim "got into it again." Defendant pulled his knife back out, "flicking it open and closed" while facing the victim. Aguirre and Morris told him to put it away. Aguirre left the parking lot with the victim, Kantowski, and Morris.

¶ 16     Chicago police officer William Stec, an evidence technician, testified that at about 6:45 a.m., he and his partner were called to 1050 West 34th Place, where they found the victim's bloody body, lying on the sidewalk next to a chain link fence. There was blood on the fence. No

weapons were recovered from the victim. Photographs of the crime scene were entered into evidence.

¶ 17    Chicago police officer Willella McKinney arrived near the scene at 7 a.m. on October 23, 2011. She spoke to defendant's father who told the officer and her partner that defendant had gone to his grandmother's house at 934 West 36th Street. The officers went to that address and found defendant walking down the street. Defendant said he had been at his girlfriend's house and took a shower. His head was shaved.

¶ 18    Dr. Ariel Goldschmidt testified that he performed the autopsy on the victim, who was 5'8" and weighed 210 pounds. Dr. Goldschmidt observed scrapes and bruises on the victim's face and body, and two knife wounds. A deep wound was inflicted to the victim's jugular vein under his left ear. The course of the neck wound "was downward four inches in depth or greater and extended through the skin and soft tissue to the left internal jugular vein." Dr. Goldschmidt observed "injuries around the stab wound" that "may or may not represent twisting of the knife." The victim also had an incise wound on the proximal aspects of his right forearm, which was consistent with a defensive wound. Dr. Goldschmidt concluded that the victim died as a result of the stab wounds and his death was a homicide.

¶ 19    Defendant's father, Ronald Vasquez, testified that at about 6:15 a.m. on October 23, 2011, he received a call from defendant and heard a raspy voice in the background saying: "I gots you [*sic*], mother*****r." Vasquez searched for defendant and found him at 35th Street and Morgan Avenue and brought him home. After defendant informed him of the stabbing, Vasquez went outside and saw squad cars headed toward his mother's home. Vasquez went to his mother's home and then called defendant and told him to come there. Defendant was arrested upon his arrival.

¶ 20    Defendant testified that at the time of trial he was 21 years old and had known the victim since 2007. The victim had a reputation for violence, and he belonged to an organization called the Three Ones which was "[b]asically a street gang." Defendant saw the victim carrying an automatic handgun in 2007.

¶ 21    On October 22, 2011, at 4:30 a.m., he and Klee went to the party. Defendant drove them in his father's vehicle.

¶ 22    At the party, Klee argued with Delgado and wanted to fight him. Klee followed him out of the house and to the parking lot. Others from the party, including defendant, also went to the parking lot. The victim held Klee back and they "pushed each other a few times," and "threw a few punches." Klee hit the victim, and Aguirre pushed Klee to the ground. Kantowski also fell to the ground during the altercation.

¶ 23    Defendant testified that Klee and the victim were arguing "back and forth." The victim called Klee a "b***h or something," and defendant "told [the victim] not to talk to my cousin like that." The victim responded that defendant should "shut [his] b***h a** up and get [himself] away from the parking lot." Defendant testified that he pulled out a folding knife and held it by his side "so they wouldn't come near me."

¶ 24    After the altercation ended, at about 6 a.m., defendant, Klee, and White searched the parking lot for the keys to his father's vehicle. The police drove by the parking lot and helped them look for the keys. When the keys were not found, the police drove them to defendant's grandmother's house. However, defendant returned to the parking lot 10 minutes later to continue searching for the keys. While defendant searched, he heard "tires screech" and saw the victim jump out of a van. Kantowski also emerged from the area of the van. The victim accused defendant of hitting Kantowski earlier and said to him: "[W]hat's up, b***h? I got you now. Your cousin ain't

here." Defendant told the victim he did not hit Kantowski. According to defendant, the victim was angry and was shouting and "swearing a lot." Kantowski stood between defendant and the victim and told defendant to leave. Defendant responded that he was still searching for the keys. Kantowski turned to the victim and said that they should leave.

¶ 25 The victim called someone from his phone and said to "bring that thing over here" and stated their location. Defendant did not know who the victim called. Defendant called his father to say that the victim was going to shoot him. Kantowski ran away. Defendant walked away from the victim, who "charged" and tackled defendant.

¶ 26 Defendant testified that he was afraid the person whom the victim had called would bring a gun to the parking lot and shoot him and he thought he was going to die. Defendant stabbed the victim once or twice with the knife "to get him off me." He "thought" the stabs were to the victim's shoulder. The victim stood up and defendant ran in the direction of his home and tossed the knife in an alley.

¶ 27 On cross-examination, defendant admitted that, during the party, he drank alcohol and, while in the parking lot, he took out his knife "so no one trie[d] to attack me," although no one was doing so. He never saw the victim with a gun or knife at that time. At the later encounter, defendant pulled the knife from his pocket as soon as the victim exited the van.

¶ 28 When defendant was asked about the phone call made by the victim where the victim stated, "bring that thing over here," defendant testified that he took that to mean that the victim was asking someone to bring a gun. Defendant never observed the victim holding a gun. After calling his father for help, defendant "jogged" away from the victim, passed three houses, and then turned around when he heard the victim approach. Defendant held the knife "open" inside his jacket pocket. The victim tackled defendant to the ground and climbed on top of defendant. When

asked whether he "plunged" his knife into the victim's neck, defendant answered: "Yes, to get him off me." Defendant said he stabbed the victim and took the knife "right out. I did not twist it or anything." After he stabbed the victim, the victim stood up. Defendant fled the scene because the victim had "just made a phone call," and someone "was going to come help him."

¶ 29 Defendant went to his father's home and shaved his hair so that the members of the Three Ones would not be able to identify him. Defendant did not call the police and did not know the victim had died until about one day later, when he was brought to the police station.

¶ 30 The trial court ruled that it would consider the victim's two prior convictions for aggravated assault as evidence of his aggressive or violent character under *People v. Lynch*, 104 Ill. 2d 194 (1984).

¶ 31 Defendant argued that he acted in self-defense or, alternatively, that he was guilty of second-degree murder based on imperfect self-defense. Imperfect self-defense is established when defendant believed he was acting in self-defense but that belief was objectively unreasonable. *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995).

¶ 32 In finding defendant guilty of first-degree murder, the trial court referred to the victim's death as "senseless." The court found the elements of self-defense had not been established stating:

> "As the State pointed out, and I totally agree, [defendant] had no reasonable or unreasonable reason to believe that the stabbing was necessary. Even reasonable or unreasonable. The evidence shows in my mind that for whatever reason [defendant] wanted to join the beef that was with his cousin [Klee] and the former boyfriend of [Klee's] then current girlfriend. It wasn't his beef, but he wanted to join in for some reason.

> Maybe he is mad that someone called his cousin [Klee], pardon my language, b***h and there is back and forth language about that nonsense. He is the one with the knife, he being [defendant]. Even he says he doesn't see a gun or anything else."

The court rejected defendant's account as to the stabbing, stating:

> "It defies belief that [defendant] somehow or another was on the ground on his back with a guy 5-8, 210 over him and he is able to get his hand in his pocket and pull the knife that is already open and stick the guy once in the neck causing a four-inch deep knife to the man in his neck and cuts him in the arm also and not believe he hurt the guy at all. He just got up and he ran off and that was the end of the story."

The court also noted that, instead of remaining at the scene, defendant quickly left, "ditche[d] the knife somewhere," and then shaved his head. The court found that the crime scene photographs were "pretty grim," and showed "the victim laying on the ground with blood all over the place."

¶ 33 After denying defendant's motion for a new trial, the court held a sentencing hearing. The State presented victim impact statements from several members of the victim's family. Defendant's mother addressed the court in mitigation, and defendant presented a statement in allocution. The trial court sentenced defendant to 35 years' imprisonment and we affirmed on direct appeal. See *Vasquez*, 2017 IL App (1st) 143870-U.

¶ 34 Defendant subsequently filed his postconviction petition alleging that his trial counsel was ineffective at trial for failing to argue for a second-degree murder verdict based on mutual combat and that his appellate counsel was ineffective for failing to raise the issue on direct appeal. The post-conviction court found no ineffective assistance because there was no evidence that the victim's death resulted from mutual combat.

¶ 35  Defendant also alleged in his postconviction petition that his 35-year sentence violated the eighth amendment and the proportionate penalties clause under *Miller v. Alabama*, 567 U.S. 460 (2012) and its progeny.

¶ 36  In *Miller*, the United States Supreme Court held that the eighth amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders convicted of homicide. *Id.* at 479. Before a life sentence can be imposed, the sentencing court must consider "mitigating circumstances" such as "an offender's youth and attendant characteristics." *Id.* at 483, 489. The Illinois Supreme Court has held that *Miller* applies to discretionary as well as mandatory life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40) and also to *de facto* life sentences, or sentences that "cannot be served in one lifetime" and have "the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole" (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10). A *de facto* life sentence means a sentence in excess of 40 years' imprisonment. *People v. Buffer*, 2019 IL 122327, ¶ 41.

¶ 37  In *People v. Harris*, 2018 IL 121932, our supreme court rejected a facial challenge that the eighth amendment protections as articulated in *Miller* should apply not just to juveniles under the age of 18, but also to young adults ages 18 to 21, noting that the United States Supreme Court has consistently drawn the line at age 18 for purposes of juvenile sentencing protections in the eighth amendment context. *Id.* ¶ 47.

¶ 38  However, *Harris* left open the possibility for an offender between ages 18 and 21 to make an as-applied challenge under the proportionate penalties clause. The *Harris* defendant contended in his proportionate penalties argument that the evolving science on juvenile maturity and brain development highlighted in *Miller* applied not only to juveniles under the age of 18 but also to young adults from 18 to 21. *Id.* ¶ 46. The supreme court noted that as-applied constitutional

challenges are dependent on the specific facts and circumstances of the person raising the challenge and therefore the record must be sufficiently developed in terms of those facts and circumstances for purposes of appellate review. *Id.* ¶ 39. The record on the direct appeal in *Harris* contained no evidence about how the evolving science on juvenile maturity and brain development applied to defendant's specific facts and circumstances. *Id.* ¶ 46. Therefore, the supreme court held that defendant's as-applied challenge under the proportionate penalties clause was premature and that such a claim was more appropriately resolved under the Act. ¶¶ 46, 48.

¶ 39    In the present case, the postconviction court summarily denied the petition's eighth amendment and proportionate penalties arguments for two reasons: (1) because *Harris* foreclosed any facial *Miller*-type challenge to an 18-year-old's sentence; and (2) under either a facial or an as-applied *Miller*-type challenge, defendant's 35-year sentence did not violate the eighth amendment or the proportionate penalties clause because it is not a *de facto* life sentence.

¶ 40    Defendant appeals the summary dismissal of his postconviction petition.

¶ 41    The Post-Conviction Hearing Act (Act) provides a method whereby a defendant can assert that his conviction or sentence resulted from a substantial denial of his constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2020). The Act provides a three-stage process for adjudication of a postconviction petition. *People v. Applewhite*, 2020 IL App (1st) 142330-B, ¶ 15. This case falls within the first stage. During the first stage, the postconviction court must assess the petition, taking the allegations as true, and determine if it is frivolous or patently without merit such that it failed to state the gist of a meritorious constitutional claim. *Id.*; *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis in either law or in fact. *People v. Tate*, 2012 IL 112214, ¶ 9. Our review of a first-stage dismissal is *de novo*. *Applewhite*, 2020 IL App (1st) 142330-B, ¶ 15.

¶ 42    First, defendant argues that the postconviction court erred by summarily dismissing his claim that his trial counsel provided ineffective assistance by failing to advance the theory of second-degree murder based on mutual combat and that his appellate counsel was ineffective for failing to raise this claim on direct appeal. To succeed on a claim of ineffective assistance of trial counsel, defendant must show that his counsel's performance fell below an objective standard of reasonableness and that such performance prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). *Strickland* applies equally to claims of ineffective appellate counsel. *People v. Petrenko*, 237 Ill.2d 490, 497 (2010).

¶ 43    In the context of a first-stage postconviction claim, defendant need only show that he can arguably meet these two standards, *i.e.*, it is arguable that his counsel was deficient and it is arguable that he was prejudiced such that the outcome of his case would have been different absent the deficient representation. *People v. Wilson*, 2013 IL App (1st) 112303, ¶ 20.

¶ 44    Defendant's postconviction claim of ineffective assistance centers on trial counsel's decision to argue self-defense and imperfect self-defense at trial in lieu of arguing second-degree murder based on mutual combat. Defendant commits second-degree murder when he commits first-degree murder and either of two mitigating factors exist. The first factor involves an unreasonable belief in self-defense (imperfect self-defense). 720 ILCS 5/9-2(a)(2) (West 2020). The second mitigating factor is that at the time of the killing, defendant was acting under a "sudden and intense passion resulting from serious provocation by the individual killed." *Id.* § 9-2(a)(1). Mutual quarrel or combat is a recognized category of serious provocation. *People v. McDonald*, 2016 IL 118882, ¶ 59.

¶ 45    "Mutual combat is a fight or struggle that both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results

from the combat." *Id.* For purposes of mutual combat, "[a] slight provocation is not enough, because the provocation must be proportionate to the manner in which the accused retaliated." *People v. Austin*, 133 Ill. 2d 118, 126-27 (1989). "There is no mutual combat where the manner in which the accused retaliates is out of all proportion to the provocation, particularly where homicide is committed with a deadly weapon." *People v. Sutton*, 353 Ill. App. 3d 487, 496 (2004). Mutual combat does not apply where defendant responds with deadly force to a physical altercation with an unarmed victim. *People v. Randall*, 2016 IL App (1st) 143371, ¶ 48.

¶ 46    In the present case, there was no evidence that the victim's death was the result of mutual combat. Kantowski and defendant were the only witnesses who testified to the actions in the parking lot immediately preceding the victim's death. Kantowski testified that after the argument at the party, she was walking home alone when the victim drove up to her and they began talking. Then they saw defendant at the nearby parking lot, looking for his keys. The victim, who did not display a weapon, exited his vehicle and asked defendant about the identity of the person who had hit Kantowski earlier. Defendant denied hitting Kantowski and showed the handle of a knife. Defendant made a phone call to someone saying that the victim would be "dead in a week." Kantowski advised the victim to walk away with her. As the victim and Kantowski were walking away from defendant, she saw an unidentified man in a black hooded shirt running toward them. The victim yelled at Kantowski to run away and get help. As she ran away, Kantowski heard the sound of something crashing into a chain-link fence.

¶ 47    Kantowski's version of the events immediately preceding the victim's death shows no evidence of mutual combat, as her testimony indicates that the victim took her advice to walk away from defendant so as to avoid a fight and then was rushed by a hooded assailant. As the victim was an unwilling participant in the fight precipitated by his assailant, mutual combat was lacking. See

*People v. Camacho*, 2016 IL App (1st) 140604 ¶ 35 (the crux of mutual combat is a "shared intent to fight between the parties" involved).

¶ 48 The other version of the events immediately leading to the victim's death was testified to by defendant. Defendant testified that while he was looking for the car keys in the parking lot following the argument at the party, the victim, who was unarmed, drove up to him in a van, jumped out, and accused him of hitting Kantowski. Defendant denied hitting her, after which the victim called someone and said to "bring that thing over here," which defendant interpreted to mean that the victim was asking someone to bring a gun so as to shoot him. Defendant walked away from the victim, who then charged and tackled defendant to the ground. In response, defendant stabbed the victim once or twice with his knife "to get him off me" and then ran away, discarded the knife, and shaved his hair.

¶ 49 Defendant's testimony indicates that he did not engage in a willing struggle upon equal terms with the victim. Rather, under defendant's version, the victim attacked him while he was walking away to avoid a fight and in response defendant stabbed the victim with the knife so as to get away. Accordingly, mutual combat was lacking. See *People v. Delgado*, 282 Ill. App. 3d 851, 859 (1996) (evidence of mutual combat is lacking where defendant found himself the unwilling participant in a fight and acted only to defend himself from attack). Defendant's use of deadly force on the unarmed victim further belies any claim of mutual combat. *Randall*, 2016 IL App (1st) 143371, ¶ 48.

¶ 50 Defendant contends the disparity in size between the victim and himself supports his claim of provocation but the record belies this argument. Dr. Goldschmidt's testimony at trial showed that the victim was 5'8" and weighed 210 pounds; defendant's arrest report showed that defendant was 5'7" and weighed 202 pounds. There was no significant disparity in size between defendant

and the victim. Further, our supreme court has held that with respect to whether mutual combat occurred "[t]he emphasis on the relative physical size of the parties is misplaced. Rather, the provocation must be proportionate to the manner in which the accused retaliated." *McDonald*, 2016 IL 118882, ¶ 62. Here, defendant's use of the knife on the unarmed victim was a disproportionate retaliation to the victim's alleged provocation and did not constitute mutual combat.

¶ 51　As there was no evidence of mutual combat presented at trial, defense counsel's decision to forego arguing for a second-degree murder verdict based thereon was not even arguably objectively unreasonable or prejudicial; similarly, appellate counsel's decision not to raise such a baseless issue on direct appeal was not arguably objectively unreasonable or prejudicial. Accordingly, we affirm the postconviction court's summary dismissal of defendant's claim of ineffective assistance premised on the failure to argue mutual combat at trial or on direct appeal.

¶ 52　Next, defendant contends that we should reverse the summary dismissal of his petition and remand for second-stage proceedings because his postconviction counsel committed ineffective assistance. The right to assistance of counsel in postconviction proceedings is a matter of legislative grace, and defendant is guaranteed only the level of assistance provided by the Act. *People v. Hardin*, 217 Ill. 2d 289, 299 (2005). Our supreme court has labeled that level "reasonable" assistance. *Id.*

¶ 53　Defendant contends that his postconviction counsel acted unreasonably by omitting a claim that trial counsel was ineffective for failing to introduce at trial any scientific evidence of the developmental immaturity of 18-year-olds (defendant's age at the time of the stabbing). Defendant argues that such scientific evidence showing that the brains of young adults continue to develop into their early twenties would have been relevant to show that he was more easily provoked than

an older adult and could have persuaded the trial court to find him guilty of second-degree murder based on mutual combat.

¶ 54    Defendant's argument is without merit because the scientific evidence of the developmental immaturity of 18-year-olds does not change the fact that under the testimony of either Kantowski or defendant, there was no mutual combat. Kantowski's testimony indicated that the victim was the unwilling participant in the fight; defendant's testimony indicated he (defendant) was the unwilling participant. Either way, the fight was not a mutual one regardless of the level of defendant's maturity or immaturity. As the admission of the scientific evidence would not have led to a finding of second-degree murder based on mutual combat, defendant was not even arguably prejudiced by his trial counsel's failure to introduce such evidence and his claim of ineffective assistance of trial counsel fails. In the absence of any arguable ineffective assistance by trial counsel, post-conviction counsel did not act unreasonably (and thereby committed no ineffective assistance) by failing to raise the issue in the petition.

¶ 55    Defendant next argues that his postconviction counsel acted unreasonably by omitting a claim that trial counsel acted ineffectively by failing to present the scientific evidence of developmental immaturity to persuade the trial court to convict him of second-degree murder based on a theory of imperfect self-defense. Defendant's argument is predicated on his testimony at trial that the victim tackled him in the parking lot and that he believed he needed to stab the victim so as to defend himself. Defendant contends that the scientific evidence of developmental immaturity would have been relevant to show that his immature brain caused him to subjectively believe in the need to use deadly force in self-defense under those circumstances, even if that belief was unreasonable. Defendant's argument fails, though, because the trial court expressly found his testimony regarding the circumstances of the fight to be incredible; the trial court disbelieved that

the victim tackled and got on top of defendant and instead found Kantowski's testimony that the victim was walking away from defendant just prior to the stabbing to be credible. The trial court found that defendant was not acting in any belief (reasonable or unreasonable) of self-defense but was instead the aggressor. Given the trial court's finding that defendant was the initiator of the fight leading to the victim's death, his conviction would not have been reduced to second-degree murder based on imperfect self-defense even if the scientific evidence of developmental immaturity had been introduced at trial. As defendant was not even arguably prejudiced by his trial counsel's failure to introduce the scientific evidence of developmental immaturity, his claim of ineffectiveness of trial counsel fails. In the absence of any arguable ineffective assistance by trial counsel, postconviction counsel did not act unreasonably, and thereby committed no ineffective assistance, by failing to raise the issue in the petition.

¶ 56    Finally, defendant argues that his postconviction counsel provided unreasonable assistance by raising only the *Miller*-based eighth amendment and proportionate penalties arguments with respect to his sentence, which centered on the alleged errors of the trial court in sentencing him to 35 years' imprisonment without adequately considering his youth or attendant circumstances and for not also arguing that trial counsel was ineffective for failing to introduce scientific evidence of his developmental immaturity at the sentencing hearing in mitigation.

¶ 57    Postconviction counsel did not act unreasonably by failing to raise a claim of ineffectiveness of trial counsel during sentencing, where there was no arguable basis to make such a claim. Review of the sentencing hearing shows that trial counsel specifically raised defendant's youth, noting that he was a "young man" who was only 21 years old as of the date of sentencing. Trial counsel further argued that defendant had no criminal record, that he has a "great deal" of family support, including his mother who addressed the court in mitigation, and that he is unlikely

to ever repeat this type of criminal conduct and that he is capable of returning to society one day and making a meaningful contribution. Trial counsel thus made cogent arguments in mitigation upon defendant's behalf, including highlighting his youth, and presented his mother as a mitigation witness and as such we cannot say that counsel's performance during the sentencing hearing was arguably objectively unreasonable rising to the level of ineffective assistance.

¶ 58    Nor was defendant arguably prejudiced by trial counsel's failure to introduce the scientific evidence of developmental immaturity during sentencing. In sentencing defendant, the trial court stated:

"And what's this murder about? Typical nonsense stuff. It wasn't even [defendant's] beef, this incident. He got involved with someone else's issues. It wasn't his beef at all. He gets involved. And a young guy, very impressive family and friends testifying, especially, his brother, that the victim was not at any time warranted in getting killed. It wasn't second degree or something else. It was murder. No question about that in my mind. ***

Usually when people make bad decisions, they don't result in some guy being murdered, however. Maybe some other bad things. But you're talking about the utmost bad happening. Young guy, left there either against a fence or near a fence, bleeding to death, stab wound to his neck.

And talk about bad decisions. That was the decision [defendant] chose to make. No one forced him to stab the guy, to have that knife earlier, carry it with him like a little badge of courage, that knife he had with him. He made his choices.

***

Taking into consideration all the factors in aggravation and mitigation, I am well aware that [defendant] is a young guy. But when you do bad things, there are bad consequences.

\*\*\*

The court has heard all the evidence, aggravation and mitigation, factors in the statute. The court is mindful and well-aware that [defendant] is a young guy. He is 21 sometime this year. He'll get older. But not [the victim].

The sentence of the court, all the evidence considered by me that it was a senseless, intentional murder, nothing less than that, will be 35 years Department of Corrections."

¶ 59   The tenor of the trial court's comments indicates that it considered that defendant's youth and immaturity contributed to his decision to intervene in an argument that did not involve him and to stab the victim, but the court determined that defendant was required to pay the consequences of his actions and that a 35-year sentence was appropriate. There is no arguable basis in the record to indicate that the court would have imposed a lesser sentence had the scientific evidence of developmental immaturity been introduced, given that the court already considered defendant's youth and immaturity when sentencing him[1]. Further, even if the scientific evidence of developmental immaturity had been introduced at sentencing, there was nothing at the sentencing hearing tying that evidence to defendant's specific facts and circumstances, making it even less likely that the court would have reduced defendant's sentence based on such evidence.

---

[1] Defendant contends that the court incorrectly observed that he was only two years younger than the victim when in fact he was five years younger. Review of the court's comments show that it knew defendant was 21 at the time of sentencing in 2014 (meaning he was 18 at the time of the stabbing in 2011) and that the victim was 23 at the time of the stabbing. The court's comments indicate no misapprehension of either the victim's age or defendant's age.

As defendant was not even arguably prejudiced by trial counsel's failure to introduce the scientific evidence of developmental immaturity during sentencing, his claim of ineffectiveness of trial counsel fails.

¶ 60    On this record, given the lack of any arguable ineffective assistance of trial counsel during sentencing, postconviction counsel did not act unreasonably, and thereby committed no ineffective assistance, by failing to raise the issue in the petition.

¶ 61    For all the foregoing reasons, we affirm the circuit court.

¶ 62    Affirmed.