# Illinois Official Reports

## Appellate Court

---

**People v. Brown, 2017 IL App (1st) 142877**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY BROWN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-2877 |
| Filed<br>Rehearing denied<br>Modified upon<br>denial of rehearing | March 27, 2017<br>April 18, 2017<br><br>April 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-19813; the Hon. Colleen Ann Hyland, Judge, presiding. |
| Judgment | Affirmed; fines, fees, and costs order corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Ann B. McLennan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, and Paul Colin Kiefer, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Justices Simon and Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant Larry Brown was convicted of burglary and sentenced to nine years in prison. On appeal, defendant contends (1) the State failed to prove beyond a reasonable doubt that he intended to commit a theft, (2) the trial court denied him his right to present a defense when it excluded certain testimony, (3) his sentence was excessive, and (4) certain monetary charges should be vacated and other charges should be offset by his presentence custody credit. We affirm and correct the order assessing fines, fees, and costs.

¶ 2                                            I. BACKGROUND

¶ 3        According to the charging document, defendant knowingly and without authority entered or without authority remained at 9532 South Hamlin Avenue in Evergreen Park (the South Hamlin house), which was owned by the Federal Home Loan Mortgage Corporation, with intent to commit therein a theft. The offense was alleged to have occurred from around September 7, 2013, through September 18, 2013. At trial, the key issue was defendant's intent. The State maintained that defendant set out to steal the South Hamlin house. Meanwhile, defendant claimed that he did not intend to commit a theft because he believed he was legally acquiring the South Hamlin house through adverse possession.

¶ 4        Throughout the trial, various witnesses referred to a collection of documents that defendant filed with the Cook County recorder of deeds on September 6, 2013. The documents consisted of the following: (1) a "Non Abandonment and Secured Interest of Property," which indicated that notice was given to the Cook County sheriff's department, the Federal Bureau of Investigation (FBI), the Chicago police department, the Illinois Department of Transportation, all lending institutions and their agents, and "Legal Authorities, to be further named" (Defendant signed this document on September 5, 2013, and the document stated in part that the South Hamlin house "has not nor will be abandoned" and that defendant was the "holder in due course and secured party."); (2) a picture of the South Hamlin house; (3) a legal description of the South Hamlin house from the Cook County map department; (4) a receipt from the map department of the Cook County clerk's office; (5) an affidavit of adverse possession; (6) an affidavit of adverse possession that included the Illinois Department of Transportation logo, and stated in part that defendant acquired title to the property "from Adverse Possession by Torrez Moore dated September 5, 2013, and recorded in the Recorder's Office of Cook County"; and (7) a notice of claim of title to real estate.

¶ 5        For the State, Officer Matthew Lecompte testified that on September 7, 2013, he encountered defendant in the Evergreen Park police station lobby. Defendant stated that he had just bought a home and wanted Officer Lecompte to escort him while he changed the locks. Officer Lecompte declined, explaining that defendant did not need police presence if he truly owned the property. Officer Lecompte did not tell defendant that he could not move into the house.

¶ 6        Robert McDonough, who lived next door to the South Hamlin house, testified that around 7:30 p.m. on September 8, 2013, he observed defendant, a woman, and two children moving mattresses, bed frames, and other items into the back door of the South Hamlin house. After McDonough and his wife introduced themselves as defendant's new neighbors, defendant said his name was Larry and introduced McDonough to the woman who was with him.

McDonough stated that there had been a realtor sign on the lawn of the South Hamlin house on September 8, but the sign was gone on September 9.

¶ 7 John Collins testified that he lived across the street from the South Hamlin house, which had been in foreclosure. Collins could not recall how long the South Hamlin house had been unoccupied. He stated that around 6 p.m. on September 10, 2013, a car pulled into the driveway of the South Hamlin house. Defendant and another person exited the car and removed a crowbar from the trunk, which they used to pry open the side door of the garage. Collins called 911 and the police arrived a short time later.

¶ 8 Officer James Whelan testified that he went to the South Hamlin house around 6 p.m. on September 10, 2013, where he observed defendant and another man in the driveway. Defendant introduced himself and stated he was the owner of the house and had bought it for back taxes. Officer Whelan recalled that defendant gave him some paperwork, presented identification, and had a key to the side door of the house, which he opened. According to Officer Whelan, "you got a key to the house and you got documents saying you own the house, you own the house." In the meantime, two other people arrived, Joan and Daniel Kunz, who also presented documents and stated that they owned the house. Officer Whelan told the Kunzes to contact their attorney "because he's got papers, too and I'm not a lawyer."

¶ 9 Detective Michael Kmetty testified that on September 17, 2013, he learned of an ownership dispute relating to the South Hamlin house. Upon investigation, Detective Kmetty learned that defendant was staying at the house illegally and had illegitimate paperwork. Detective Kmetty also learned that Joan and Daniel Kunz had legitimate paperwork that showed they were closing on the house. Subsequently, Detective Kmetty obtained an arrest warrant for defendant. On September 18, 2013, defendant arrived at the police station, where he was read *Miranda* warnings and interviewed. According to Detective Kmetty, defendant stated that he had obtained adverse possession paperwork from someone named Torrez Moore and filed the paperwork with the Cook County recorder of deeds. Defendant further stated that he planned to live in the South Hamlin house forever. Defendant recalled that he changed the locks on the house by prying them off with a screwdriver and then brought his belongings inside. Defendant gave Detective Kmetty permission to look through his iPhone, which contained numerous listings for houses and their prices.

¶ 10 The parties also presented stipulated testimony. It was stipulated that Jim Kennedy, a realtor and broker, would testify that he was contracted by the Federal Home Loan Mortgage Corporation to list the South Hamlin house. As part of his responsibilities, he installed a for-sale sign on the front lawn and placed a lockbox on the building. Kennedy would further testify that he was never contacted by and did not know a person named Larry Brown.

¶ 11 It was further stipulated that Loris Ryan, a real estate agent, would testify that Joan and Daniel Kunz made an offer to buy the South Hamlin house on September 6, 2013, and Joan Kunz signed a contract that same day. The contract was ultimately accepted on September 9, 2013, by Brian Tracy, who acted as the attorney-in-fact for the owner, the Federal Home Loan Mortgage Corporation.

¶ 12 Additionally, the parties stipulated that Brian Tracy would testify that no one from the Federal Home Loan Mortgage Corporation was contacted by Larry Brown about the South Hamlin house. Additionally, no one at the Federal Home Loan Mortgage Corporation was notified by defendant about his attempt to establish ownership of the South Hamlin house.

Tracy would also maintain that he had no personal contact with defendant and did not give defendant permission to take possession and control of the South Hamlin house.

¶ 13    It was further stipulated that Joan Kunz would testify that after signing the contract, she and her husband went to view the South Hamlin house on September 10, 2013. When she arrived, defendant was in possession of the house. Joan Kunz would also state that before September 10, 2013, she had never met defendant and did not have any conversations with him about the South Hamlin house.

¶ 14    The parties also presented stipulations about defendant's documents. Peter Karahalios, the deputy treasurer and chief legal counsel of the Cook County treasurer's office, would testify that defendant did not make any payments for real estate taxes owed on the South Hamlin house. Additionally, the parties stipulated that Dweina Turner, a clerk with the Cook County recorder of deeds, would testify that the recorder of deeds is responsible for recording documents pertaining to the transfer of title of real estate, mortgages, and loans, among other items. Turner would further state that documents that are presented for recording are not reviewed for their legal purpose and that any document is recorded as long as it appears to be related to a real property, contains a property index number, and a fee is paid. The parties also stipulated that Liam Reardon, an assistant State's Attorney assigned to the mortgage fraud task force, would testify that he reviewed the documents that defendant presented to Officer Whelan and determined that the documents had no legal significance as to establishing ownership of the South Hamlin house.

¶ 15    After the State rested, defense counsel moved for a directed finding, contending that there was no evidence of wrongful intent. Defense counsel further asserted that all the evidence showed that defendant was following a path that he believed to be legal. The court denied the motion.

¶ 16    Testifying in his defense, defendant stated that he first learned about adverse possession when he was previously incarcerated. According to defendant, adverse possession required that "you had to take possession of a property. Stay in it for an amount of time openly and notoriously, exclusive; and after a period of time, you would gain full title to the property." Defendant further explained that to gain full title, he had to stay in the property for 20 years or for 7 years if he paid taxes. Defense counsel and defendant had the following exchange:

"Q. And after you got out of jail, with regard to adverse possession, what did you do?

A. Well, a cousin of mine said she had acquired property through adverse possession. I was introduced to Torrez Moore who told me.

MR. JAKALSKI [Assistant State's Attorney]: Objection to what Torrez Moore said.

THE COURT: Sustained.

THE WITNESS: Well, I was introduced to—

MR. JAKALSKI: Objection, no question pending.

THE COURT: Sustained.

MR. GROSSMAN [defense counsel]: Well, he can say I was introduced to Torrez Moore.

THE COURT: Ask another question."

¶ 17        Defendant stated that after he was released from prison, he was looking for a home, and so he started searching Realtor.com for foreclosed bank-owned properties. After defendant saw that the South Hamlin house was listed as foreclosed and bank-owned, he contacted the number that was listed on the property. Defendant believed that the South Hamlin house was abandoned. The following exchange about defendant's process occurred between defense counsel and defendant:

"Q. At that point, had you been told by anyone what to do to acquire these properties?

MR. JAKALSKI: Objection.

THE COURT: Sustained.

Q. What is it that caused you to do what you just testified to?

MR. JAKALSKI: Objection, [Y]our Honor.

THE COURT: Overruled.

THE WITNESS: I was trying to obtain a property for me and my family. I was told that I could file—

MR. JAKALSKI: Objection to what he was told.

THE WITNESS: Well, I learned—

THE COURT: Hold on. There's an objection. What is the basis of your objection?

MR. JAKALSKI: Hearsay. I was told. Don't know by who. What's the purpose for the statement?

THE COURT: Your response.

MR. GROSSMAN: Yes, [Y]our Honor. The answer is not to prove the ultimate truth or falseness of what he was being told, but that information flow, not the truth [or] falseness of what's being told.

THE COURT: You can say he spoke to others, but I don't want to hear what the information was. So sustained as to what he was told.

***

Q. [Defense counsel:] So you spoke to other; is that correct?

A. Correct.

Q. Then what did you do?

A. I filed paperwork with the recorder of deeds.

Q. And that's these nine documents ***; is that correct?

A. Correct.

Q. And to the best of your knowledge, that was establishing your right to occupy the premises?

MR. JAKALSKI: Objection, leading.

THE COURT: Sustained.

Q. [Defense counsel:] What did you believe filing those documents would do for you?

A. It commenced the period of adverse possession.

Q. After you filed these documents, *** what did you do?

A. I called the water department and asked them to change the billing over to my name.

Q. What water department?

A. In Evergreen Park.

Q. Then what did you do?

A. Then I called the police department. I told them I would need an officer to go with me to change the locks. They instructed me to come into the—

MR. JAKALSKI: Objection to what they said.

THE COURT: Sustained."

¶ 18    Defendant stated that after the conversation with a policeman, he changed the locks and took possession of the house. The following day, his girlfriend and her kids moved in, along with her brother. Defendant further stated that he cut the grass after he moved in. Defendant denied that he told Officer Whelan that he bought the house for back taxes and maintained that he told the officer that he had filed an adverse possession claim.

¶ 19    Defendant also testified about his aforementioned documents. Defendant stated that he had submitted the documents to the FBI in Chicago, the Cook County sheriff's office, the Evergreen Park police department, the Illinois Department of Transportation, and the Chicago police department. The following exchange then occurred between defendant and defense counsel:

"Q. Why to the FBI?

A. I was told that I was to give notice to everyone.

Q. Why to the Sheriff of Cook County?

MR. JAKALSKI: Objection to hearsay.

THE COURT: Sustained.

MR. GROSSMAN: Except it addresses the purpose of sending

a document.

MR. JAKALSKI: Objection.

THE COURT: Sustained. It's hearsay.

Q. [Defense Counsel:] But it was tendered to give notice, is that correct?

A. To give notice."

¶ 20    Defendant went on to state that he sent the documents to the Evergreen Park police department to give them notice because the house was located in Evergreen Park. Defendant explained that he sent the documents to the Chicago police department to give notice as well, even though the house was in Evergreen Park. Defendant further stated that he sent the documents to the Illinois Department of Transportation because it deals with all commerce in the state.

¶ 21    Defendant further testified that he was living at the South Hamlin house when Joan and Daniel Kunz arrived on September 10. Defendant stated that he showed his documents to Daniel Kunz, the Kunzes' real estate agent, and an Evergreen Park health inspector, who he also gave a tour of the house. Defendant further stated that he was told he had to file transfer stamps and get a certificate of occupancy and a safety inspection, and so the following week he went to the village hall to pick up the relevant information. At a later point, defendant

received a call from his girlfriend's mother, whereupon he went to the police station and was arrested.

¶ 22 Additionally, defendant testified about text messages that were found on his phone between him and a number he received from the Realtor.com listing for the South Hamlin house. The messages were as follows:

"LISTING: Waiting on signed documents from seller. I guess, closing in next few weeks.

DEFENDANT: Well I'm working on acquiring the deed as we speak. When I get it can we sit down?

LISTING: You can call me, sure, but home is under contact and will only remain on MLS until all signatures making it an executed contract.

DEFENDANT: Well, I'm filing a claim on the property with the recorder of deeds in the morning."

Defendant also sent a message that read, "That property is currently bank-owned, correct."

¶ 23 According to defendant, the message that the house was under contract meant that defendant still had an opportunity to acquire the property. Defendant maintained that the bank only had constructive possession of the house, indicating that the bank had not actually taken possession of the property.

¶ 24 To impeach defendant's testimony, the State entered into evidence certified statements of conviction that indicated that defendant had two prior burglary convictions.

¶ 25 In closing, the State asserted that defendant used deception to obtain unauthorized control of the South Hamlin house. The State recounted what it asserted was evidence of defendant's guilty mind: he always appeared ready to present bogus documents, portions of the documents were untrue, he lied to Officer Lecompte that he bought the property, and he lied to Officer Whelan that he paid the back taxes on the property. According to the State, defendant would not have lied if he believed he had ownership by adverse possession. The State also noted that defendant entered the house with a screwdriver and that defendant knew the house was bank-owned. Additionally, the State asserted that adverse possession was "designed for people who lived out in the country" and defendant's various notices were meaningless. The State characterized defendant's efforts as "a bunch of subterfuge."

¶ 26 Defense counsel contended in closing that whether defendant was entitled to adverse possession was not relevant. Defense counsel asserted that defendant thought he was acting legally and noted that no one told defendant to leave the house. Defense counsel further stated that defendant believed he had to file his documents to establish his rights to the house.

¶ 27 Ultimately, defendant was found guilty of burglary. In its ruling, the court stated in part that it had reviewed the arguments of the parties and the allegation that defendant "was legally in possession of the property due to adverse possession." The court also noted that the matter came down to a credibility question. The court stated that defendant's documents were lacking in content and did not support the notion that defendant had continued, uninterrupted possession of the property. The court additionally found that the adverse possession defense "was a huge scam" and stated it did not believe defendant "one bit."

¶ 28 Subsequently, defendant filed a motion to dismiss, or in the alternative, for a new trial. Defendant contended that the State failed to prove he had the requisite criminal intent for burglary. According to defendant, his actions showed that whether or not he had the legal

right to take the house, he believed his actions were authorized under law and he did what he believed was necessary to legally acquire the house. Defendant also asserted that he relied on legal authority that he believed allowed him to act as he did. Additionally, defendant contended that the indictment should be dismissed and he should be released because his right to a speedy trial was violated. Following a hearing, the court denied defendant's motion.

¶ 29     Turning to sentencing matters, a presentence investigation report (PSI) indicated that defendant was 33 years old and had completed some college. According to the PSI, defendant had received a full academic scholarship after high school to attend Iowa State University, where his major was computer engineering. Defendant later left that school and went on to attend DeVry Institute. The PSI also stated that defendant had worked full-time at the Ford assembly plant in Chicago from February 2012 until he was arrested in September 2013. Previously, defendant worked for Southern Electric Coil in Indiana. The PSI further stated that while he was at the Cook County jail, defendant completed a culinary arts class and received a certificate in sanitation. Additionally, the PSI noted that defendant was in a long-term relationship with the mother of his 12-year-old son.

¶ 30     At the sentencing hearing, the State noted defendant's criminal history and stated that he was a Class X offender. The State asserted that defendant was convicted of burglary in 2009, for which he was sentenced to two years' probation. The State also noted that defendant violated that probation when he committed another burglary, for which he was sentenced to 5½ years in prison and was discharged on March 27, 2013. The State asserted that in total, defendant committed three burglaries in about five years. Additionally, the State contended that the burglary here involved an entire home and the victims included the owner and prospective buyers. The State asked for a sentence of 10 years.

¶ 31     Defense counsel noted that defendant participated in numerous programs while in jail. Defense counsel also stated that defendant was working full-time when the incident occurred and he had reestablished a relationship with the mother of his child. Defense counsel further asserted that defendant could likely go back to his job when he was released. Additionally, defense counsel contended that defendant had been very open about his conduct.

¶ 32     Defendant also presented a statement at the sentencing hearing. Defendant stated that he did not have any ill intent and that the house had been abandoned. Defendant further stated that he thought he was acting legally and had tried to provide a home for his family.

¶ 33     In sentencing defendant to nine years in prison as a Class X offender, the court acknowledged that the State had presented certified copies of defendant's convictions, which were both Class 2 felonies. The court further stated that it considered the evidence presented in aggravation and the mitigation evidence about defendant's participation in programs while incarcerated. According to the court, however, defendant lacked rehabilitative potential, as he committed this burglary only six months after his release from prison for a previous burglary. The court characterized the instant offense as "a scam which this [d]efendant thought he could get away with." Additionally, the court found it insulting that defendant represented that the buyers of the house were at fault. The court stated that it was "obviously preposterous" that defendant tried to act as if he rightfully belonged in the house. The court asserted that in fashioning the sentence, it considered defendant's acts and statements, as well as his failure to take responsibility. The court concluded that:

"When I considered all those facts as well as the mitigation that's been presented with regards to the [d]efendant's family, his prior employment, and what he's done while in the custody of the Department of Corrections, it's the sentence of this Court you will be sentenced to nine years in the Illinois Department of Corrections."

¶ 34 The parties agreed that defendant had spent 364 days in presentence custody. Defendant was assessed various charges, including a $5 electronic citation fee, $5 court system fee, $15 state police operations fee, $2 State's Attorney records automation fee, $2 public defender records automation fee, $15 automation fee, and $15 document storage fee. In all, defendant's fines, fees, and costs totaled $479, which was reduced to $399 by defendant's presentence custody credit.

¶ 35 Defendant subsequently appealed.

¶ 36                                II. ANALYSIS

¶ 37                          A. Sufficiency of the Evidence

¶ 38 On appeal, defendant first contends that the State failed to prove defendant guilty beyond a reasonable doubt because he never intended to commit a theft. Defendant argues that he set out on a misguided, but earnest attempt to acquire a home for his family through adverse possession. Defendant asserts that he was trying to follow the law of adverse possession and continuously attempted to possess the house openly and notoriously without trying to conceal his actions. Defendant further states that he thought the house was abandoned and no one ever told him to leave the property, which reaffirmed his belief that he was acting properly. Defendant additionally argues that the trial court misunderstood his defense and the State's closing argument reinforced that misunderstanding.

¶ 39 When reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992). The reviewing court must not retry the defendant. *People v. Cunningham*, 212 Ill. 2d 274, 279-80 (2004). Instead, "[t]he reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard" the witnesses. *Id.* at 280. In a bench trial, it is for the trial judge to determine the credibility of the witnesses, weigh and draw reasonable inferences from the evidence, and resolve any conflicts in the evidence. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). At the same time, a reviewing court considers all of the evidence, and not just the evidence convenient to the State's theory of the case. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). Additionally, a reviewing court "may affirm on any grounds in the record, regardless of whether the trial court relied on those grounds or whether the trial court's reasoning was correct." *Vulpitta v. Walsh Construction Co.*, 2016 IL App (1st) 152203, ¶ 22. We "will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Sutherland*, 155 Ill. 2d at 17.

¶ 40 As charged here, a person commits burglary when without authority he knowingly enters or without authority remains within a building with intent to commit therein a theft. 720 ILCS 5/19-1 (West 2012). At issue is only whether the evidence was sufficient to prove that defendant intended to commit a theft. Intent may be proven through circumstantial evidence. *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 14. Relevant considerations include the time,

place, and manner of entry into the premises, the defendant's activity within the premises, and any alternative explanations for his presence. *People v. Maggette*, 195 Ill. 2d 336, 354 (2001). Further, the question is not whether any possible innocent explanation exists, but whether the evidence was sufficient to allow a rational trier of fact to infer that the defendant intended to commit theft when he entered the building. See *Rudd*, 2012 IL App (5th) 100528, ¶ 14.

¶ 41     Although we agree with defendant that whether he actually met the elements of adverse possession is not relevant, a brief summary of adverse possession is helpful. To establish title by adverse possession, the claimant must prove possession of a property for a 20-year period and the "possession must have been (1) continuous; (2) hostile or adverse; (3) actual; (4) open, notorious, and exclusive; and (5) under claim of title inconsistent with that of the true owner." (Internal quotation marks omitted.) *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 37; 735 ILCS 5/13-101 (West 2012). Alternatively, a claimant can show actual and adverse possession of lands for seven years, contemporaneously with paying taxes under color of title. 735 ILCS 5/13-109 (West 2012); *Malone v. Smith*, 355 Ill. App. 3d 812, 816 (2005).

¶ 42     To be sure, there was evidence that defendant was indeed trying to adversely possess the South Hamlin house. Defendant filed documents with the Cook County recorder of deeds and testified that he notified various government agencies of his plans. Evidence was presented that defendant acted openly. According to Robert McDonough, who lived next door, defendant introduced himself and moved his belongings into the house during the evening hours. Defendant reported that he cut the grass. Additionally, defendant maintained that he was trying to obtain a property for himself and his family and that he believed that filing the paperwork would commence the period of adverse possession.

¶ 43     At the same time, there was also evidence that the adverse possession claim was a ruse, and that defendant's true intentions were to steal the house from the prospective buyers. Per the text messages presented at trial, defendant was informed that the house was under contract and that it would close in a few weeks. Officer Whelan testified that defendant told him that he had bought the house for back taxes, which we acknowledge that defendant denied. Officer Lecompte testified that defendant told him defendant had just bought the house and wanted an escort while defendant changed the locks. John Collins, another neighbor, testified that he observed defendant and another person use a crowbar to pry open a door on the garage. As for the differing accounts of defendant's statements, it was for the trier of fact to resolve inconsistencies across the witnesses' testimony. *People v. Brazziel*, 406 Ill. App. 3d 412, 423 (2010). Moreover, even if defendant's version of events was the only one, the trial court did not need to believe it, and could consider other facts and circumstances in the record that tended to contradict the defendant's story or at least raised serious questions about its probability. *People v. Price*, 158 Ill. App. 3d 921, 926-27 (1987). Based on defendant's conflicting statements and suspicious behavior, the trial court could reject defendant's claim that he made an earnest attempt to acquire the house, and instead find that defendant used his adverse possession documents as cover for his plan to steal the house. Further, "[t]he trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court *** that saw and heard the witnesses." *Wheeler*, 226 Ill. 2d at 114-15. The case essentially hinged on whether the trial court believed that defendant's adverse possession claim was sincere. The court did not

believe so, and other evidence indicated that defendant intended to commit a theft of the house. We reject defendant's challenge to the sufficiency of the evidence of his intent.

¶ 44                                    B. Excluded Testimony

¶ 45    Next, defendant asserts that the trial court denied him of his right to present a defense when it prevented him from testifying about how and what he learned about adverse possession. Defendant states that defense counsel repeatedly tried to elicit testimony about how and what defendant learned about adverse possession, but the trial court improperly excluded the statements as hearsay. Defendant argues that the testimony at issue did not go to the truth of the matter asserted and would have explained why defendant acted as he did. Defendant contends that by preventing this testimony, the trial court precluded defendant from establishing that he did not possess the necessary intent for burglary.

¶ 46    "A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. As noted above, defendant asserts that the trial court prevented him from presenting a complete defense by improperly excluding certain testimony as hearsay, which is defined as an out-of-court statement offered to establish the truth of the matter asserted. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009). The primary rationale for excluding hearsay testimony "is the inability of the opposition to test the testimony's reliability through cross-examination of the out-of-court declarant." *People v. Weatherspoon*, 394 Ill. App. 3d 839, 850 (2009). Relevant here, "[a]n out-of-court statement offered to prove its effect on a listener's mind or to show why the listener subsequently acted as he did is not hearsay and is admissible." (Internal quotation marks omitted.) *People v. Sorrels*, 389 Ill. App. 3d 547, 553 (2009). This court reviews a trial court's decision about the admission of hearsay for an abuse of discretion. *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 20.

¶ 47    Defendant points to the following portions of testimony that he states were improperly excluded: (1) what Torrez Moore told defendant after defendant's release; (2) after defendant saw a listing for the South Hamlin house on Realtor.com and contacted a number, whether defendant had been told by anyone what to do to acquire a property and what he was told to file; (3) what the police told defendant when he told the police he needed an escort to change the locks; and (4) why he sent paperwork to the Cook County sheriff. The State responds that defendant forfeited the claim that the trial court deprived him of the right to present a defense because he failed to raise it in his motion for a new trial.

¶ 48    To preserve an alleged error for appeal, a party must both object at trial and raise the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Recognizing that defense counsel did not raise the claim at issue in his motion for a new trial, defendant proposes three grounds for review: as a constitutional issue that was raised at trial, as plain error, and on the basis that his counsel was ineffective for failing to preserve the alleged error.

¶ 49    Our supreme court has stated that three types of claims are not subject to forfeiture for failing to file a posttrial motion: (1) constitutional issues that were properly raised at trial and may be raised later in a postconviction petition, (2) challenges to the sufficiency of the evidence, and (3) plain errors. *People v. Cregan*, 2014 IL 113600, ¶ 16 (citing *Enoch*, 122 Ill. 2d at 190). See also *People v. Almond*, 2015 IL 113817, ¶ 54. The constitutional issues exception is rooted in judicial economy. *Cregan*, 2014 IL 113600, ¶ 18. "If a defendant were

- 11 -

precluded from raising a constitutional issue previously raised at trial on direct appeal, merely because he failed to raise it in a posttrial motion, the defendant could simply allege the issue in a later postconviction petition." *Id.*

¶ 50 The key phrase here is "properly raised at trial." Here, the constitutional issues exception is not available to defendant because he did not raise a constitutional issue at trial. Defendant asserts that he was denied his constitutional right to present a defense and that a constitutional issue was raised during the State's motion *in limine* before trial and through defense counsel's argument via the State's objections at trial. The record indicates otherwise. The State's motion *in limine* sought to bar any testimony from defendant about other properties that were obtained in a similar fashion that defendant tried to obtain the South Hamlin house. The State asserted that it had never been provided with the names of the owners or addresses for those properties, information about those properties was irrelevant, any such testimony would be hearsay, and the State had not had an opportunity to investigate those properties. In response, defense counsel stated that the only testimony on that topic would be that defendant had a family member who acquired two properties and connected him to the person who helped him acquire the South Hamlin house. Defense counsel stated that the testimony would "just be part of what happened, which would be leaving out a piece if it wasn't put in there." The court ultimately found the State's motion premature. In the exchange about the motion *in limine*, defense counsel noted that not including certain testimony "would be leaving out a piece," but defense counsel did not raise a constitutional issue. Defendant also asserts that a constitutional issue was raised during the State's objections to portions of defendant's testimony that defendant states were improperly excluded. However, defense counsel's arguments about why certain testimony should be admitted related to whether the statements were hearsay or not. Again, there was no mention that to exclude those statements would deny defendant his constitutional right to present a defense. Further, our review of the record does not indicate that defendant ever asserted that he was denied his constitutional right to present a defense.

¶ 51 For the constitutional issue exception to apply, the defendant must have properly raised a constitutional issue at trial. *People v. Burnett*, 2015 IL App (1st) 133610, ¶ 79. Because defendant did not assert that excluding defendant's testimony would prevent him from presenting a defense, the constitutional issue exception is not available to defendant. See *id.* ¶¶ 72, 76-79 (where the defendant objected to a statement at trial on the grounds that the statement did not fit various statutory exceptions to the hearsay rule, the constitutional issue exception did not apply to the defendant's claim on appeal that by admitting the statement into evidence, his sixth amendment right to confront and cross-examine witnesses against him was violated).

¶ 52 We next address defendant's request for plain error review. "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step is to determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 53    Here, we agree with defendant that the trial court should have admitted the statements at issue because they were not hearsay—they were offered to show why defendant acted as he did. See *Weatherspoon*, 394 Ill. App. 3d at 850 (statement offered to explain why the witness acted in a particular way is not hearsay). The testimony about Torrez Moore would have explained why he began the adverse possession process. The testimony about whether defendant was told what to do and file would have explained why took the steps he did. The testimony about what the police told defendant about changing the locks would have explained why he went to the police station. Further, the testimony about the Cook County sheriff was intended to explain why defendant sent the documents to him.

¶ 54    However, plain error requires that the error was reversible error, which did not occur here. See *People v. Naylor*, 229 Ill. 2d 584, 602, 605 (2008) (stating that absent reversible error, there is no plain error, and considering whether the trial court committed reversible error before determining whether the evidence at trial was closely balanced). Improper exclusion of testimony about a defendant's intent or motive that is essential to his defense is reversible error unless other sufficient evidence of his intent or motive is admitted at trial. *People v. Miller*, 327 Ill. App. 3d 594, 598 (2002). See also *People v. Upton*, 230 Ill. App. 3d 365, 371 (1992) (improper exclusion of state-of-mind testimony by an accused that is essential to his defense will ordinarily constitute reversible error unless other sufficient evidence of intent is admitted at trial). Here, even though the trial court excluded some of defendant's testimony about why he acted as he did, there was ample additional testimony related to defendant's alleged attempt to acquire the house through adverse possession. Defendant testified that he learned about adverse possession in prison and that his cousin had acquired a property through adverse possession. Defendant also described his understanding of what he had to do to acquire a house by adverse possession. Additionally, defendant testified that he searched for a home on Realtor.com and thought the South Hamlin house had been abandoned. Defendant further stated that he thought he still had the opportunity to acquire the house. Defendant also testified that he filed documents because he thought that would begin the period of adverse possession and that he sent the documents to several government agencies to give notice. Overall, defendant presented much testimony in support of his claim that he believed that he was acting legally via adverse possession. Under these circumstances, the trial court's exclusion of the testimony noted above was not reversible error. Compare *Weatherspoon*, 394 Ill. App. 3d at 851-52 (no reversible error where, although the defendant was not permitted to testify that a group threatened him or that he felt fearful as a result, the alleged threat was presented through other means and the evidence and arguments were sufficient to acquaint the jury with an explanation of his flight that was compatible with his innocence), with *Miller*, 327 Ill. App. 3d at 598-99 (reversible error where there was no explanation allowed for the defendant's conduct). As there was no reversible error, there was no plain error.

¶ 55    Defendant also asserts that his counsel was ineffective for failing to argue in a posttrial motion that the trial court should reverse its earlier exclusion of his testimony. To succeed on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As for prejudice, a defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. *Id.* Further, there must be a reasonable probability that, but for counsel's errors, the

- 13 -

result of the proceeding would have been different. *People v. Patterson*, 192 Ill. 2d 93, 122 (2000). A reasonable probability is " 'a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). An ineffective assistance claim can be disposed of on the grounds that the defendant was not prejudiced, without deciding whether counsel's performance was deficient. *People v. Caballero*, 126 Ill. 2d 248, 260 (1989).

¶ 56 Here, we find that defendant's counsel was not ineffective because defendant was not prejudiced by counsel's failure to raise the hearsay issue in a posttrial motion. As noted above, defendant was given ample opportunity to present his defense that he believed he was legally pursuing adverse possession. Thus, counsel's failure to preserve the error did not deprive defendant of a fair trial.

¶ 57 Because defendant cannot claim the constitutional issue exception, the hearsay issue does not constitute plain error, and counsel was not ineffective on this point, defendant has forfeited his argument. See *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 26 (forfeiture applies when an issue is not raised in a timely manner).

¶ 58                                          C. Excessive Sentence

¶ 59 Next, defendant contends his nine-year sentence was excessive in light of various mitigating factors. Defendant notes that he thought he was following the procedures required to adversely possess the South Hamlin house. Additionally, defendant states that the house was vacant and bank-owned when defendant occupied it. According to defendant, the trial judge also did not adequately consider defendant's rehabilitative potential. Defendant acknowledges his past burglaries, but asserts that he had strong family ties, a full-time job, and accomplishments while incarcerated. Defendant contends that his mitigation evidence was not reflected in his sentence.

¶ 60 The Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial court has broad discretionary powers in imposing a sentence, and the trial court's decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This reflects the circumstance that the trial court is normally in a better position than a reviewing court to consider such factors as credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. McCain*, 248 Ill. App. 3d 844, 850 (1993). This court will not disturb a sentence that falls within the statutory limits unless the trial court abused its discretion. *People v. Brooks*, 297 Ill. App. 3d 581, 585 (1998).

¶ 61 The State asserts, and defendant recognizes, that defendant's sentencing claim would ordinarily be forfeited because defense counsel did not file a motion to reconsider the sentence. See 730 ILCS 5/5-4.5-50(d) (West 2012) ("A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the circuit court clerk within 30 days" after the sentence is imposed.). Defendant urges this court to review his excessive sentence claim for plain error and contends that his counsel was ineffective for failing to preserve the matter.

¶ 62 To establish plain error in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Defendant also asserts that sentencing issues are excepted from the doctrine of

waiver because they affect a defendant's substantial rights, citing *People v. Owens*, 377 Ill. App. 3d 302, 304 (2007). We decline the invitation to shortcut the plain error analysis. To clarify, the alleged error here was forfeited rather than waived. See *Palm*, 2013 IL 110505, ¶ 26 (forfeiture applies when an issue is not raised in a timely manner). More to the point, the principle that sentencing errors are always reviewable as plain error was rejected by *People v. Rathbone*, 345 Ill. App. 3d 305, 310-11 (2003) ("it is not a sufficient argument for plain error review to simply state that because sentencing affects the defendant's fundamental right to liberty, any error committed at that stage is reviewable as plain error"). Other cases have followed *Rathbone*, and we do so here as well. See, *e.g.*, *People v. Hanson*, 2014 IL App (4th) 130330, ¶¶ 28-29 (noting the court has declined to automatically apply the plain error doctrine to forfeited sentencing claims); *People v. Ahlers*, 402 Ill. App. 3d 726, 731-32 (2010) (following *Rathbone*). Defendant must meet the requirements of the plain error doctrine to avoid forfeiture. See *People v. Smith*, 321 Ill. App. 3d 523, 534-35 (2001) (stating that the defendant must demonstrate that his sentence amounted to a plain error to circumvent waiver).

¶ 63     As noted above, the first step of plain error review is determining whether any error occurred. *Thompson*, 238 Ill. 2d at 613. Here, there was no error because defendant's nine-year sentence was not an abuse of discretion. Due to his background, defendant was sentenced as a Class X offender, which carries a sentencing range of 6 to 30 years. 730 ILCS 5/5-4.5-95(b), 5-4.5-25(a) (West 2012). A sentence within the statutory limits will be deemed excessive and an abuse of discretion "where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. While the trial court must consider rehabilitation, the trial court does not need to give more weight to the goal of restoring the defendant to useful citizenship than it places on the seriousness of the offense. *People v. Johnson*, 206 Ill. App. 3d 542, 551 (1990). Further, while the trial court may not disregard mitigating evidence, it may determine the weight to attribute to such evidence. *People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993).

¶ 64     Here, the record indicates that the trial court considered mitigating evidence, but determined that it was outweighed by other factors. In announcing the sentence, the trial court stated that it had considered mitigating evidence, such as defendant's participation in programs while incarcerated, his family ties, and his prior employment. However, the court found that defendant lacked rehabilitative potential, stating that defendant committed the instant burglary only six months after his release from prison for a previous burglary. The court also stated that defendant failed to take responsibility and that his conduct amounted to a scam. It was the trial court's responsibility to strike the appropriate balance between rehabilitating defendant and the seriousness of the offense. *Johnson*, 206 Ill. App. 3d at 551-52. Additionally, defendant has the burden to show that the trial court did not consider the rehabilitative evidence and mitigating factors before it. *Brazziel*, 406 Ill. App. 3d at 434. We also note that where relevant mitigating evidence is before the court, we presume the court considered it, absent some indication in the record to the contrary other than the sentence itself. *People v. Dominguez*, 255 Ill. App. 3d 995, 1004 (1994). Here, the record indicates that the trial court considered mitigating evidence, but gave it less weight than other factors, which the trial court was entitled to do. This court may not substitute its judgment for that of the trial court merely because it would have weighed the various factors differently. *Stacey*, 193 Ill. 2d at 209.

¶ 65        Defendant also urges this court to compare his circumstances to those of the defendant in another case, *People v. Center*, 198 Ill. App. 3d 1025 (1990). We decline to do so, as our supreme court has rejected an approach that compares sentences between defendants in unrelated cases. See *People v. Fern*, 189 Ill. 2d 48, 56 (1999). The trial court here did not abuse its discretion in sentencing defendant. As there is no error, there cannot be plain error either. See *Thompson*, 238 Ill. 2d at 613.

¶ 66        Defendant further contends that his counsel was ineffective for failing to file a motion to reconsider the sentence. As noted above, to succeed on an ineffective assistance of counsel claim, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. We reiterate that to show prejudice, there must be a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Patterson*, 192 Ill. 2d at 122. Additionally, a claim can be disposed of on the ground that the defendant was not prejudiced by counsel's alleged error without deciding whether counsel's performance was deficient. *Caballero*, 126 Ill. 2d at 260. Here, there is not a reasonable probability that the sentence would have been different if counsel had filed a motion to reconsider the sentence. A motion to reconsider the sentence would not have changed the result where the mitigating evidence that defendant highlights was considered by the trial court at the sentencing hearing.

¶ 67        Overall, because there is no plain error and counsel was not ineffective, defendant's challenge to his sentence is forfeited.

¶ 68                                   D. Fines and Fees

¶ 69        Finally, defendant challenges certain charges that were imposed. Defendant contends that this court should vacate the $5 electronic citation fee and $5 court system fee. Defendant also asserts that this court should grant $5-per-day credit for time served to offset the $15 state police operations fee, $2 public defender records automation fee, $2 State's Attorney records automation fee, $15 automation fee, and $15 document storage fee.

¶ 70        Defendant did not raise the propriety of the charges in the trial court, and ordinarily, the matter would be forfeited. Generally, to preserve a claim of a sentencing error, a defendant must make a contemporaneous objection and file a written postsentencing motion. *Hillier*, 237 Ill. 2d at 544-45. However, the rules of waiver and forfeiture also apply to the State. *People v. Reed*, 2016 IL App (1st) 140498, ¶ 13. The State does not raise forfeiture, and so we will address the merits of defendant's claims. *Id.* We also note that per Illinois Supreme Court Rule 615(b)(1), we may reverse, affirm, or modify the judgment or order from which the appeal is taken without remand. We review the propriety of assessed fees and fines *de novo* because the matter raises a question of statutory interpretation. *People v. Price*, 375 Ill. App. 3d 684, 697 (2007).

¶ 71        As for the electronic citation fee and court system fee, we find, and the State concedes, that they should be vacated because they do not apply to burglaries. The electronic citation fee is to be paid by a defendant "in any traffic, misdemeanor, municipal ordinance, or conservation case upon a judgment of guilty or grant of supervision." 705 ILCS 105/27.3e (West 2012). The court system fee is to be paid by a defendant "on a judgment of guilty or a grant of supervision for violation of the Illinois Vehicle Code *** or violations of similar provisions contained in county or municipal ordinances committed in the county." 55 ILCS

5/5-1101(a) (West 2012). Burglary does not fall into the categories listed in either statute. As a result, we vacate those charges.

¶ 72    Next, defendant asserts that he is entitled to $5-per-day credit for time served against the state police operations fee, public defender records automation fee, State's Attorney records automation fee, automation fee, and document storage fee.

¶ 73    Section 110-14(a) of the Code of Criminal Procedure provides that anyone incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of that offense is allowed a credit of $5 per day. 725 ILCS 5/110-14(a) (West 2012). Whether defendant is entitled to presentence custody credit depends on whether the charges at issue are fees or fines, which is a matter of statutory of interpretation that we review *de novo*. *People v. Jones*, 223 Ill. 2d 569, 580 (2006). The label used by the legislature for a given charge is not necessarily definitive. *Id.* at 583. Instead, we follow the framework set out in *People v. Graves*, 235 Ill. 2d 244 (2009), for deciding whether a charge is a fee or fine. "A 'fee' is defined as a charge that 'seeks to recoup expenses incurred by the state,' or to compensate the state for some expenditure incurred in prosecuting the defendant." *Id.* at 250 (quoting *Jones*, 223 Ill. 2d at 582). "A 'fine' *** is 'punitive in nature' and is 'a pecuniary punishment imposed as part of a sentence on a person convicted of a criminal offense.' " (Internal quotation marks omitted.) *Id.* (quoting *Jones*, 223 Ill. 2d at 581). "[T]he most important factor is whether the charge seeks to compensate the state for any costs incurred as the result of prosecuting the defendant." *Id.*

¶ 74    As for the state police operations fee (705 ILCS 105/27.3a(1.5) (West 2012)), we find, and the State concedes, that it is a fine and therefore it is offset by defendant's presentence custody credit. See *People v. Maxey*, 2016 IL App (1st) 130698, ¶ 141; *People v. Moore*, 2014 IL App (1st) 112592, ¶ 46.

¶ 75    Next, we turn to the State's Attorney records automation fee (55 ILCS 5/4-2002.1(c) (West 2012)) and public defender records automation fee (55 ILCS 5/3-4012 (West 2012)). Defendant contends these charges are fines. The State's Attorney records automation fee is:

>    "to be paid by the defendant on a judgment of guilty or a grant of supervision for a violation of any provision of the Illinois Vehicle Code or any felony, misdemeanor, or petty offense to discharge the expenses of the State's Attorney's office for establishing and maintaining automated record keeping systems. The fee shall be remitted monthly to the county treasurer, to be deposited by him or her into a special fund designated as the State's Attorney Records Automation Fund. Expenditures from this fund may be made by the State's Attorney for hardware, software, research, and development costs and personnel related thereto." 55 ILCS 5/4-2002.1(c) (West 2012).

¶ 76    Reviewing courts have found that this charge is a fee. See *People v. Taylor*, 2016 IL App (1st) 141251, ¶ 29 (stating that charge is compensatory rather than punitive); *People v. Warren*, 2016 IL App (4th) 120721-B, ¶ 115 (finding that per the plain language of the statute, the assessment is intended to reimburse State's Attorneys for expenses related to automated record-keeping systems, and so the assessment is a fee); *Reed*, 2016 IL App (1st) 140498, ¶ 16 (stating that charge is compensatory in nature, and finding that the State's Attorney would have utilized its automated record keeping systems in prosecuting the defendant when it filed charges with the clerk's office and made copies of discovery, which were tendered to the defense); *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 30 (stating that

charge is a fee because it is intended to reimburse the State's Attorneys for their expenses related to automated record-keeping systems). We recognize that a contrary result was reached in *People v. Camacho*, 2016 IL App (1st) 140604, ¶¶ 50-56, which found that the State's Attorney and public defender records automation assessments were fines. Nonetheless, we will follow the weight of authority that holds that the State's Attorney records automation fee is indeed a fee. As such, defendant may not offset that charge with presentence custody credit.

¶ 77    Turning to the public defender records automation fee, this charge is:

"to be paid by the defendant on a judgment of guilty or a grant of supervision for a violation of any provision of the Illinois Vehicle Code or any felony, misdemeanor, or petty offense to discharge the expenses of the Cook County Public Defender's office for establishing and maintaining automated record keeping systems. The fee shall be remitted monthly to the county treasurer, to be deposited by him or her into a special fund designated as the Public Defender Records Automation Fund. Expenditures from this fund may be made by the Public Defender for hardware, software, research, and development costs and personnel related thereto." 55 ILCS 5/3-4012 (West 2012).

¶ 78    This court has found that because the statutory language of the public defender records automation fee is identical to that of the State's Attorney records automation fee except for the name of the organization, there is no reason to distinguish between the two statutes, and thus the public defender charge is a fee as well. *Maxey*, 2016 IL App (1st) 130698, ¶ 144. Nonetheless, we vacate the public defender records automation fee because defendant was represented by private counsel at trial. *Taylor*, 2016 IL App (1st) 141251, ¶ 30.

¶ 79    Lastly, we turn to the automation fee and document storage fee, which defendant contends are both fines. As for the automation fee, the Clerks of Courts Act states:

"The expense of establishing and maintaining automated record keeping systems in the offices of the clerks of the circuit court shall be borne by the county. To defray such expense in any county having established such an automated system or which elects to establish such a system, the county board may require the clerk of the circuit court in their county to charge and collect a court automation fee ***." 705 ILCS 105/27.3a(1) (West 2012).

¶ 80    As for the document storage fee, the Clerks of Courts Act states:

"The expense of establishing and maintaining a document storage system in the offices of the circuit court clerks in the several counties of this State shall be borne by the county. To defray the expense in any county that elects to establish a document storage system and convert the records of the circuit court clerk to electronic or micrographic storage, the county board may require the clerk of the circuit court in its county to collect a court document fee ***." 705 ILCS 105/27.3c(a) (West 2012).

¶ 81    This court has found that the automation and document storage charges are fees because they "are compensatory and a collateral consequence" of a conviction. *People v. Tolliver*, 363 Ill. App. 3d 94, 97 (2006). Defendant asserts that the basis for the *Tolliver* decision cannot survive our supreme court's more recent decision in *Graves*, 235 Ill. 2d at 250-51. However, *Tolliver* used the same framework as was set forth in *Graves* for determining whether a charge is a fee or fine. See *Tolliver*, 363 Ill. App. 3d at 96-97 (stating that a fee is a

charge for labor or services and is compensatory in nature, while a fine is a pecuniary punishment imposed as part of a criminal sentence); *Graves*, 235 Ill. 2d at 250 (stating that a fee compensates the state for some expenditure incurred in prosecuting the defendant, while a fine is a pecuniary punishment imposed as part of a sentence on a person convicted of a criminal offense). *Tolliver* is consistent with *Graves*, and as such, we follow its finding that the automation and document storage charges are fees that cannot be offset by presentence custody credit.

¶ 82 In sum, we vacate the $5 electronic citation fee, $5 court system fee, and $2 public defender records automation fee. The $15 state police operations fee is offset by defendant's presentence custody credit. With these corrections, defendant's fines, fees, and costs total $372.

¶ 83                                    III. CONCLUSION

¶ 84 For the foregoing reasons, the judgment of the circuit court is affirmed and we order the clerk of the circuit court to correct the order assessing fines, fees, and costs.

¶ 85 Affirmed; fines, fees, and costs order corrected.