2024 IL App (1st) 230383-U

No. 1-23-0383

Order filed September 30, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 13732 |
| | ) | |
| DAVID GIURGIU, | ) | Honorable |
| | ) | Paul Pavlus, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm defendant's convictions for aggravated criminal sexual assault and aggravated criminal sexual abuse where the circuit court's decision to allow the State to use leading questions was not improper, the State proved the *corpus delicti*, and defendant's sentence was not excessive.

¶ 2     Following a jury trial, defendant David Giurgiu was found guilty of aggravated criminal sexual assault and aggravated criminal sexual abuse and sentenced to 35 years in prison. On appeal, Giurgiu argues that (1) the State's use of leading questions improperly suggested material elements

of the victim's testimony, (2) the State failed to prove the *corpus delicti* of the offenses, and (3) his sentence was excessive where the trial court did not properly consider and weigh evidence in mitigation. We affirm.

¶ 3                                             I. BACKGROUND

¶ 4      Giurgiu was charged with multiple offenses against the elderly victim, J.I.. The State proceeded on one count of aggravated criminal sexual assault premised on contact between Giurgiu's penis and J.I.'s mouth. The State also proceeded on three counts of aggravated criminal sexual abuse premised on J.I. touching Giurgiu's penis, Giurgiu touching J.I.'s vagina, and Giurgiu transferring semen to J.I.'s body. The State alleged that Giurgiu knew J.I. was unable to give knowing consent and that J.I. was 60 years of age or older. See 720 ILCS 5/11-1.30(a)(5) (West 2018); 720 ILCS 5/11-1.60(a)(3) (West 2018).

¶ 5      Prior to trial, the State filed a motion pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2018)) seeking to admit other crimes evidence of a sexual assault against C.D., a patient under Giurgiu's care at Glenbrook Hospital, to prove Giurgiu's motive, identity, *modus operandi*, intent, absence of mistake, and propensity to commit acts of sexual assault.

¶ 6      The State asserted that Giurgiu was a nurse at Glenbrook Hospital and that while C.D. was in Giurgiu's care, he instructed her to hang her arm off the bed while he administered medication into her intravenous (IV) port. Giurgiu began rubbing his penis against C.D.'s hand with his pants still on. He then removed his pants and placed his bare penis in C.D.'s hand. C.D. turned her hand away. Giurgiu masturbated and told C.D. to open her mouth; when she refused to do, he ejaculated

on her face and chest. Giurgiu then cleaned C.D. up with her hospital gown and discharged her from the hospital.

¶ 7    Giurgiu objected to the other crimes evidence, arguing the incident was more prejudicial than probative. Following a hearing, the trial court allowed the State to introduce the incident for motive, identity, *modus operandi*, intent, absence of mistake, and propensity, finding the probative value outweighed the prejudicial effect.

¶ 8    At trial, Natalie Lewandowski testified that she was previously employed as an emergency room nurse at Glenbrook Hospital in Glenview, Illinois. Lewandowski stated that she worked alongside Giurgiu at the hospital and identified him in court. On November 22, 2018, just before midnight, 76-year-old J.I. was brought to the hospital by paramedics, who had given J.I. fentanyl for her pain. Lewandowski spoke with J.I., got her medical history, and learned that she had pain down the left side of her body due to a fall. Lewandowski noted that J.I. was crying, "looked very uncomfortable," and relayed that her pain was a "100 out of 10." Lewandowski then administered additional pain medication to J.I. in an effort to control her pain. J.I. was then sent for a CT scan, which revealed that she had a left hip fracture. Surgery was scheduled for later that morning, and J.I. was placed on bed rest. Because J.I. was not supposed to get out of bed, Lewandowski needed to insert a catheter; Giurgiu assisted Lewandowski with this procedure. Lewandowski's shift ended at 3:00 am, at which point she turned over J.I.'s care to Giurgiu. She gave him J.I.'s medical history and made him aware of all the medications J.I. had been given. Lewandowski stated that the pain medications J.I. had received—including fentanyl and Dilaudid—were sedatives that could make a patient sleepy, drowsy, and confused, and that "[t]he older the patient is, the more susceptible they are to *** [the medications'] side effects."

¶ 9    J.I. testified next. She was 80 years old at the time of trial, and was seated in a wheelchair during her testimony. She admitted that she was struggling with memory issues, and said her health and memory had recently gotten worse. When she was asked where she lived, she was unable to answer, replying, "That's a good question." However, she was able to recall facts relating to her trip to Glenbrook Hospital on the night of November 22, 2018. She said that after she fell, she went to the hospital in an ambulance. She was crying and told a female nurse she was in pain. The nurse put an IV in her arm and informed her she had a broken left hip. When the State asked J.I. if she had a male nurse after the female nurse, defense counsel objected to the question as leading, but the trial court overruled the objection. J.I. answered that a male was working on her after the female nurse, but she was unable to identify Giurgiu as that individual in court. When the State asked J.I. if she was alone with that male nurse, defense counsel objected, and the trial court sustained the objection.

¶ 10   The State asked J.I. if anyone asked her to do something with her hand. Defense counsel objected again, and the trial court sustained the objection. When the State asked J.I. what the male nurse had her do, J.I. stated, "[t]his is very difficult for me to answer," but eventually stated a cup was put in her mouth. The State asked her if anything else was put in her mouth, and defense counsel objected. After the trial court overruled the objection, J.I. stated that something else was put in her mouth, but she was having trouble remembering.

¶ 11   The State asked J.I. if anything bad happened to her in the emergency room, and defense counsel objected. The trial court sustained the objection. After the State rephrased its question and asked J.I. what happened to her in the emergency room, J.I. testified she could not remember what happened to her in the emergency room, stating, "this is so frustrating for me." The State asked

J.I. if someone put something in her hand, and defense counsel objected. The trial court overruled the objection. J.I. stated a cup was put in her hand. The State asked if anything else was put in J.I.'s hand. Defense counsel objected, but the trial court overruled the objection. After testifying that "not only a cup" was put in her hand, J.I. said she "[couldn't] sit still." The State told J.I. she was "almost done" and that she "needed to sit." At that point, defense counsel asked for the help of J.I.'s "support team". The court asked J.I.'s support assistant to sit beside J.I. in order to keep her from getting up during testimony. The support assistant told J.I., "I'm right here. I'm not going anywhere."

¶ 12    The State asked again if something besides a cup was put in her hand, and defense counsel objected as the question was asked and answered. The trial court overruled the objection. J.I. said that something else was put in her hand. The State asked again if something besides a cup was put in her hand, and defense counsel objected. The trial court overruled the objection. J.I. testified she could not remember what was put in her hand, but then she said a "putz" was put in her hand. When the State asked J.I. if "putz" was a Yiddish word, she confirmed that it was. When the State asked J.I. what a "putz" was, J.I. said, "Putz means, umm – Oh, I can't." She continued, "Please help me. Just help me." When the State asked J.I. if a "putz" was a part of the body, J.I. confirmed it was. When the State asked J.I. what part of the body a "putz" was, J.I. said "Oh, God" and defense counsel objected. The trial court overruled the objection. J.I. answered a "putz" was a penis and said the male nurse at the hospital put his penis in her hand.

¶ 13    The State asked if the male nurse put his penis anywhere else, and defense counsel objected. The trial court sustained the objection. When the State asked J.I. if the male nurse "d[id] anything else to [her]," J.I. stated the male nurse put his penis in her mouth. The State then asked

J.I. if that person did anything when his penis was in her mouth, and defense counsel objected again. After the trial court overruled the objection, J.I. stated the male nurse ejaculated in her mouth. J.I. said she did not want that to happen, that she did not touch the male nurse's body first, and that she never came on to him before he did what he did. After direct examination was complete, J.I. said, "Get me out of here. My stomach is killing me." On cross-examination, J.I. stated, "this is killing me." J.I. testified on cross that she had problems with her memory and said her memory had gotten worse recently.

¶ 14    Following J.I.'s testimony, defense counsel moved for a mistrial and asked for J.I.'s testimony to be stricken based on his objections to the State's leading questions, and also because the prosecutor was standing within a few feet of J.I. during J.I.'s testimony and J.I.'s support assistant was holding J.I. and rubbing her leg during her testimony. The trial court denied the motion, stating that given the circumstances, *i.e.*, J.I. being 80 years old, in a wheelchair, and having an "inability *** to hear," the court gave the State a "lot of leeway" in questioning. It stated, "I believe based on the circumstances and the totality of the circumstances that the prosecutor at no time did anything improper."

¶ 15    C.D. testified that she was 56 years old. In August 2019, she went to Glenbrook Hospital due to an ulcer that was causing her pain. A female nurse administered a dose of Dilaudid, a pain medication, through an IV port in her left arm. Afterwards, her care was transferred to a male nurse. C.D. identified Giurgiu as that male nurse.

¶ 16    Giurgiu was standing on the right side of the bed when he began administering C.D. a second dose of Dilaudid. Giurgiu asked C.D. to hang her left arm with the IV port off the bed. He wrapped his legs around her arm where his "testicles were sitting in [her] hand" and his "penis was

a little bit up [her] arm." Giurgiu then began to rub his penis and testicles on C.D.. C.D. asked Giurgiu to stop, but he did not and replied that it "[felt] good." C.D. closed her eyes and put her head back. Giurgiu asked her to open her mouth prior to ejaculating but C.D. refused. Giurgiu then pulled C.D.'s gown up and ejaculated on her chest and face. He finished administering the Dilaudid, wiped C.D.'s face with her gown, told her where her discharge papers were, and left the room.

¶ 17    C.D. saw semen when she opened her eyes but did not see Giurgiu's penis as he had already put it back into his pants. C.D. did not consent to Giurgiu placing his penis in her hand and did not agree to any sexual act with Giurgiu.

¶ 18    Glenview police detective Michael Koontz testified that he interviewed Giurgiu in December 2018 as part of the investigation into J.I.'s case. Koontz asked Giurgiu if he had a sexual encounter with J.I., but Giurgiu denied it. Koontz reviewed surveillance footage, medical records, and a pillow collected as evidence, but decided to suspend the investigation based on insufficient evidence at that point.

¶ 19    Later, Koontz received information regarding Giurgiu and another victim, C.D., and he resumed the investigation into J.I.'s case. Koontz interviewed Giurgiu for a second time in September 2019. The interview was video and audio recorded and the State entered it into evidence and published it for the jury.

¶ 20    The video was furnished on appeal, and this court has viewed it. In the video, Giurgiu initially denies the sexual encounters with J.I. and C.D.. He then states that he had a consensual encounter with C.D. where she touched his penis and "masturbated" him. He says he ejaculated on her chest after she lifted up her gown. He states he did not purposefully brush against her and

he did not touch her. He also states that he had a consensual encounter with J.I. where, after her care was transferred to him, she "seduced" him, "masturbated" him, he touched her vagina, and she performed oral sex on him and he ejaculated in her mouth. He also states that J.I. came into the emergency room "screaming" and in a lot of pain from a dislocated hip. He states that neither J.I nor C.D. said no to the sexual encounters.

¶ 21     The State rested its case and the defense presented no witnesses. After deliberations, the jury found Giurgiu guilty of one count of aggravated criminal sexual assault and three counts of aggravated criminal sexual abuse.

¶ 22     Giurgiu filed a motion for a new trial, arguing, *inter alia*, that the trial court erred in overruling defense counsel's objections to the leading questions during J.I.'s testimony on direct examination. The trial court denied the motion.

¶ 23     Giurgiu's presentence investigation report (PSI) reflected that he was 29 years old at the time of sentencing and in a relationship with his girlfriend who lived in Romania. He was raised by both parents, had a "blessed childhood," and was never neglected. Giurgiu had a good relationship with both parents and his four siblings. He graduated from a Christian academy in 2011, received his bachelor's degree in nursing in 2017, and was an "A and B student." He had never experienced physical, psychological, or sexual abuse and had no prior convictions. Giurgiu's interests included going to church, singing in the church choir, and being a youth leader at his church. Giurgiu was in good physical health, had never been treated for mental health, behavior, or learning disorders, and never tried alcohol or illegal drugs.

¶ 24     At sentencing, the State presented the testimony of Detective Koontz. He testified that during his interview with Giurgiu in September 2019, Giurgiu made admissions about J.I., C.D.,

and a third victim. The State entered a recording of the interview into evidence. The video was furnished on appeal, and this court has viewed it. In the video, Giurgiu states that he had a consensual encounter with a third victim who came into the hospital drunk. He states that she "groped" him. Koontz was unable to identify the third victim.

¶ 25    The State also asked the trial court to consider C.D.'s trial testimony in aggravation.

¶ 26    J.I.'s daughter delivered a victim impact statement. She stated that Giurgiu chose to prey on a vulnerable patient entrusted to his care, and that her mother, J.I., was "never the same" after the assault. She said J.I. became withdrawn, stopped seeing friends and family after the assault, was afraid all the time, and never wanted to leave the house or be alone. She said J.I. "somehow found the courage and strength to testify against [her] attacker when she was incredibly frightened" and that J.I. was "mortified to have to speak aloud to a room full of strangers and relive that terrible day." She said J.I. lived in perpetual fear after the assault until her death several months after trial.

¶ 27    The State read a victim impact statement from Donna Boreman. Boreman stated that she had known J.I. for over 50 years and that J.I. was like a second mother to her. Boreman said J.I.'s anxiety increased after the assault, she became depressed, and her fear "destroyed her." Boreman said her life and the lives of J.I. and J.I.'s daughter had been turned "completely upside down" by the assault, and she requested a sentence "at the maximum allowed by law for each of the counts against [Giurgiu]."

¶ 28    Defense counsel presented a mitigation package including Giurgiu's life summary prepared by a social worker and numerous letters from members of Giurgiu's community. Defense counsel read a letter from Giurgiu's parents, who stated their separation from Giurgiu pending his trial and sentencing was "very trying" for them, their other children, and Giurgiu.

¶ 29    Giurgiu's older brother testified that Giurgiu had a good heart and that their family and community loved him and would support him no matter the outcome.

¶ 30    Giurgiu testified in allocution that he "sincerely and deeply" regretted what occurred and the pain and suffering he caused. He described the situation as "the greatest mistake of [his] life" and stated he was taking steps toward rehabilitation.

¶ 31    The trial court said it had considered the evidence presented at trial, the PSI, the history, character, and attitude of Giurgiu, and the evidence and arguments presented at sentencing including all statutory factors in aggravation and mitigation. The trial court found in mitigation that Giurgiu had no prior criminal background and had been given "every opportunity anyone could ask for." The court noted that Giurgiu went to a Christian academy, was part of a church community, and had a family that loved him. The court also noted, however, that Giurgiu was put on notice when J.I. spoke to the police about the assault, but then proceeded to sexually assault another victim afterwards and referenced a third sexual assault victim in his interview with Koontz.

¶ 32    In aggravation, the court considered the serious harm done to J.I., who was 76 years old at the time of the assault, by Giurgiu's "horrible unspeakable act," which caused J.I. to start "seeing a therapist to try to erase the horrible memory of that time in the hospital." Additionally, the court noted that the hospital is "supposed to be a place of safety" but that instead of using his position as a nurse to "make someone feel comfortable in their hour of pain and need," Giurgiu used his position to prey on individuals who could not help themselves because they were injured, on pain medications, or intoxicated.

¶ 33    The court sentenced Giurgiu to concurrent terms of five, five, and seven years for three counts of aggravated criminal sexual abuse premised on J.I. touching Giurgiu's penis, Giurgiu

touching J.I.'s vagina, and Giurgiu transferring semen to J.I.'s body, respectively. The court sentenced Giurgiu to 28 years for one count of aggravated criminal sexual assault premised on contact between Giurgiu's penis and J.I.'s mouth. The aggravated criminal sexual abuse sentences were to run consecutive to the aggravated criminal sexual assault sentence for an aggregate term of 35 years in prison. Defense counsel filed a motion to reconsider sentence *instanter* which was denied by the trial court.

¶ 34                                    II. ANALYSIS

¶ 35    A. Leading Questions

¶ 36    On appeal, Giurgiu first argues that the State's use of leading questions improperly suggested material elements of J.I.'s testimony. It is generally improper to lead a witness except on cross-examination. *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 72. However, whether leading questions may be asked is within the sound discretion of the trial court. *People v. Taylor*, 132 Ill. App. 2d 473, 484 (1971). "In some cases of apparent necessity or convenience it is admissible to ask leading questions." *Crean v. Hourigan*, 158 Ill. 301, 303 (1895). For example, leading questions have been permitted in Illinois and in other jurisdictions where the victim was a child in a criminal sexual abuse case. See, *e.g., People v. Calusinski*, 314 Ill. App. 3d 955, 959 (2000) (finding no abuse of discretion when the trial court "permit[ed] the State to examine the victim in a leading manner" given the victim's age and "the difficult subject matter presented"); *State v. Boillard,* 789 A.2d 881, 887 (R.I. 2002) (affirming the State's use of leading questions on direct examination of a sixteen-year-old boy who was reluctant to discuss the details of his molestation where the questions "were used to direct [the victim's] testimony to the desired topics and incidents, not to suggest the tenor of the desired reply"). Leading questions have also been

permitted "when the witness *** has difficulty in understanding the question because of immaturity, age *** or *** the examiner seeks to aid the witness' recollection or refresh his memory when the witness has exhausted his memory without stating the particular matters required[.]" *State v. Greene*, 285 N.C. 482, 492 (1974) (finding no abuse of discretion when the trial court permitted the State to ask leading questions on direct, noting that "because of his opportunity to observe the witnesses and because of his knowledge of the circumstances of the particular case, the trial judge is in better position than an appellate court to decide the proper course of a trial so as to establish the truth and protect the rights of an accused"); *Padilla v. State,* 278 S.W.3d 98, 106 (Tx. Crim. App. 2009) (finding no abuse of discretion in the court's decision to permit the State to ask leading questions when the record showed the victim "had to be reminded more than once to speak louder, *** appeared to be very reluctant to testify about these events in front of a courtroom full of people, *** was having trouble remembering the events that had occurred over a year before trial, and *** was eventually overcome with emotion during direct examination"). A reviewing court will not reverse a conviction obtained through the use of leading questions unless "the trial court abused its discretion and *** such abuse resulted in substantial injury to the defendant." *Taylor*, 132 Ill. App. 2d at 484.

¶ 37    Here, given the circumstances, the trial court did not abuse its discretion when it permitted the State to use several leading questions during J.I.'s direct examination. To start, J.I. was 80 years old at the time of trial. She was in a wheelchair, had difficulty hearing, and admitted she was struggling with memory issues. She could not remember where she lived, and at one point in her testimony, she indicated that it was "so frustrating for [her]" that she could not remember what happened to her in the emergency room. During J.I.'s testimony, she became increasingly agitated,

particularly when the State started asking her questions regarding the sexual assault. After stating that "not only a cup" was put in her hand, J.I. said she "[couldn't] sit still" and attempted to get up out of her wheelchair, which prompted the State to reassure J.I. that she was "almost done" and that she "needed to sit" and prompted defense counsel to ask for the help of J.I.'s "support team." And when the State asked J.I. to explain what a "putz" was after she said the male nurse put a "putz" in her hand, J.I. responded, "Putz means, umm – Oh, I can't. Please help me. Just help me" and "Oh, God." J.I. said that she wanted to leave, and that her stomach was "killing" her. Based on J.I.'s emotional distress during her testimony, her reluctance to discuss the sexual assault in open court, and her trouble detailing what happened almost four years earlier, the State's use of leading questions was necessary to redirect J.I. and to focus her testimony during direct examination.

¶ 38    Moreover, the trial court sustained some of defense counsel's objections during J.I.'s questioning, including when the State asked J.I. if anyone had her "do anything" with her hand, if anything bad happened to her in the emergency room, and if the male nurse put his penis anywhere besides her hand. This suggests the trial court carefully considered which questions were proper and which were impermissible. Furthermore, in denying Giurgiu's motion for a mistrial premised on the leading questions, the court explicitly stated that, given the circumstances, *i.e.*, J.I. being 80 years old at the time of her testimony, her being in a wheelchair, and her inability to hear well, the court felt it necessary to give the State a "lot of leeway" in its questioning. Based on the circumstances outlined above and the trial court's "superior position to *** observe the witnesses' demeanor" (*People v. Sorenson*, 196 Ill. 2d 425, 431 (2001)), we find that the trial court did not abuse its discretion in allowing the use of some leading questions at trial.

¶ 39    Even if the trial court abused its discretion in permitting the leading questions, however, Giurgiu did not suffer substantial prejudice. The other evidence adduced at trial, *i.e.*, Giurgiu's statements to Detective Koontz in which he first denied any sexual contact but then claimed consensual sexual contact with both J.I. and C.D., Lewandowski's testimony that she turned J.I.'s care over to Giurgiu, and C.D.'s account of a similar sexual assault by Giurgiu, was sufficient to establish Giurgiu's guilt. Therefore, any error resulting from the use of leading questions was harmless. See *People v. Schuldt*, 217 Ill. App. 3d 534, 542 (1991) (leading questions in an aggravated criminal sexual assault case were harmless error "under the circumstances presented"). We cannot say the trial court abused its discretion in permitting some leading questions to J.I..

¶ 40    B. *Corpus Delicti*

¶ 41    Next, Giurgiu argues that the State failed to prove the *corpus delicti* of aggravated criminal sexual assault and aggravated criminal sexual abuse. In Giurgiu's opening brief, he posits that the *corpus delicti* of the offenses was not proven where J.I. did not identify him as the offender, her testimony was "unreliable," and "there was no reliable, independent evidence that corroborated [his] statement to detectives and connected him with the offenses." The State responds that Giurgiu did not raise a proper challenge to the *corpus delicti* because his argument "concedes" that the offenses occurred. In his reply brief, Giurgiu maintains that J.I.'s testimony "did not tend to show that an offense occurred" and also "fell short of sufficiently connecting [him] to the offenses at issue."

¶ 42    To sustain a conviction, the State must prove beyond a reasonable doubt both (1) the *corpus delicti*, or the commission of a crime, and (2) the identity of the offender. *People v. Lara*, 2012 IL 112370, ¶ 17. Generally, the *corpus delicti* cannot be proven by a defendant's admission or out-

of-court statement alone. *Id.* When a defendant's statement is part of the *corpus delicti*, the State must also provide independent corroborating evidence of his guilt. *Id.* This corroboration requirement stems from the mistrust of confessions. *People v. Furby*, 138 Ill. 2d 434, 447 (1990). However, this independent corroborating evidence must only tend to show the commission of a crime and need not be so strong as to prove the commission of the offense beyond a reasonable doubt. *Lara*, 2012 IL 112370, ¶ 18. If the evidence is sufficient, it is considered together with the defendant's own statements in establishing the *corpus delicti*. *Id.*

¶ 43 Construing Giurgiu's contention on appeal as a challenge to the *corpus delicti* of the offenses, his argument fails. Here, Giurgiu told police that he touched J.I.'s vagina, that J.I. touched his penis and "masturbated" him, and that he ejaculated in J.I.'s mouth. Lewandowski testified that she transferred J.I.'s care to Giurgiu on the night of the offense, and J.I. testified that the male nurse who took over her care put his penis in her hand and in her mouth and ejaculated in her mouth. She stated she did not consent to this encounter. Thus, independent evidence corroborated Giurgiu's statements and tended to show that a crime occurred. While Giurgiu argues that J.I.'s testimony was deficient due to leading questions, that claim, as we explain above, lacks merit. Therefore, in conjunction with Giurgiu's own statements, independent evidence established the *corpus delicti* of the charged offenses.

¶ 44 To the extent that Giurgiu argues that the State failed to prove his identity as the offender, "a confession alone *is* sufficient evidence of the defendant's *identity*" and a defendant's identity need not be corroborated by evidence apart from his own statements. *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 200 (emphasis in original); *People v. Ross*, 329 Ill. App. 3d 872, 883 (2002). The State was not required to introduce other evidence of Giurgiu's identity as the perpetrator

where Giurgiu himself made admissions during his interview that he committed the assault. " 'A confession tending to show defendant committed the crime, along with the proof of *corpus delicti*, is sufficient to justify the conviction.' " *Valdez*, 2022 IL App (1st) 181463, ¶ 200 (quoting *People v. Pena*, 174 Ill. App. 3d 281, 286 (1988)).

¶ 45    C. Excessive Sentence

¶ 46    Lastly, Giurgiu argues that his aggregate 35-year sentence is excessive where the trial court failed to properly consider and weigh evidence in mitigation.

¶ 47    The Illinois Constitution provides that a trial court shall impose a sentence balancing "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial court has broad discretionary powers when imposing a sentence, and this court will not disturb a sentence within the statutory limits absent an abuse of discretion. *People v. Burton*, 2015 IL App (1st) 131600, ¶¶ 35-36. An abuse of discretion occurs when a sentence "varies greatly from the spirit and purpose of the law" or is "manifestly disproportionate to the nature of the offense." *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 23.

¶ 48    In fashioning a sentence, the trial court must consider "both the seriousness of the offense and the defendant's rehabilitative potential" and carefully consider all factors in aggravation and mitigation. *Id.* ¶ 24; *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. These factors include "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The seriousness of the offense is the most important factor in determining an appropriate sentence, and the court is not required "to give greater weight to mitigating factors than to the seriousness

of the offense." *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. Furthermore, the presence

of mitigating factors does not "require a minimum sentence or preclude a maximum sentence." *Id*.

¶ 49    Giurgiu was sentenced to 28 years in prison on one count of aggravated criminal sexual

assault, which, as charged, is a Class X felony carrying a sentencing range of 6 years to 30 years

in prison. 720 ILCS 5/11-1.30(a)(5), (d) (West 2018); 730 ILCS 5/5-4.5-25 (West 2018). He was

also sentenced to concurrent terms of 5 years, 5 years, and 7 years in prison on three counts of

aggravated sexual abuse, which, as charged, are Class 2 felonies carrying a sentencing range of 3

to 7 years in prison. 720 ILCS 5/11-1.60(a)(3), (g) (West 2018); 730 ILCS 5/5-4.5-35 (West 2018).

Giurgiu's aggregate 35-year sentence falls within the range prescribed by the legislature.

¶ 50    Defendant argues the aggregate 35-year prison term, just two years short of the maximum

37-year term, is excessive where the trial court failed to properly consider and weigh evidence in

mitigation, including his lack of criminal history, remorse, education, employment history, strong

family ties, and potential for rehabilitation.

¶ 51    A trial court may not ignore evidence in mitigation, but it may determine the weight given

to such evidence. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 63. We presume the sentencing

court considered evidence in mitigation at sentencing. *Burton*, 2015 IL App (1st) 131600, ¶ 38. To

rebut this presumption, a defendant must make an affirmative showing that the sentencing court

did not consider the relevant factors. *Id*. Furthermore, we will not substitute our judgment for that

of the trial court merely because we would have weighed the sentencing factors differently. *Jones*,

2019 IL App (1st) 170478, ¶ 50.

¶ 52    Giurgiu has not shown that the trial court failed to properly consider or weigh mitigating

factors at sentencing. Instead, the record reveals that the trial court considered all factors in both

aggravation and mitigation in fashioning Giurgiu's sentence. Specifically, in mitigation, the trial court stated that it had reviewed the 40 letters submitted by defense counsel as well as the mitigation report, and it noted that Giurgiu lacked a criminal background and had a good upbringing. It mentioned Giurgiu's supportive family and strong ties to his church. However, more striking to the court was the seriousness of Giurgiu's actions and the impact they had on J.I. and her family. The court also weighed the fact that Giurgiu had used his position as a nurse entrusted to provide medical care to prey on those who could not protect themselves, the fact that Giurgiu reoffended at least once more shortly after assaulting J.I., and the fact that he reported to police that there had been a third vulnerable victim. After weighing the aggravating and mitigating factors, the court determined that the aggravating circumstances weighed heavily against Giurgiu and undermined his rehabilitative potential. *Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 53    Given the seriousness of Giurgiu's crime, the 35-year sentence neither departs greatly from the spirit or purpose of the law nor is it manifestly contrary to constitutional guidelines. *Burton*, 2015 IL App (1st) 131600, ¶ 38. Thus, we find nothing to indicate that the trial court abused its discretion at sentencing.

¶ 54    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 55    Affirmed.